CITY STATE BANK IN WELLINGTON,
Plaintiff-Appellant,

v.

UNITED STATES FIDELITY &
GUARANTY COMPANY,
Defendant-Appellee.

No. 84–1927.

United States Court of Appeals,
Fifth Circuit.

Dec. 19, 1985.

**1104**

Jones, Day, Reavis & Pogue, Thomas R. Jackson, Robert F. Middleton, Dallas, Tex., for plaintiff-appellant.

Winstead, McGuire, Sechrest & Minick, Allen W. Kimbrough, Michael L. Parham, Clifford F. Altekruse, Thanksgiving Tower, Dallas, Tex., for defendant-appellee.

Before GARZA, JOHNSON, and JERRE S. WILLIAMS, Circuit Judges.

JOHNSON, Circuit Judge.

Plaintiff-appellant City State Bank in Wellington, Texas ("CSB"), sued its former bonding company, defendant-appellee United States Fidelity & Guaranty Company ("USF & G"), to recover a claim made under CSB's Bankers Blanket Bond for losses resulting from the dishonest activity of CSB's former president, Chester Long. The district court granted judgment in favor of defendant USF & G, and City State Bank appeals. This Court affirms.

## I. BACKGROUND

CSB is a small state-chartered bank located in Wellington, Texas. CSB is significantly smaller than the only other bank in Wellington, the Wellington State Bank. CSB was financially troubled during much of the period discussed in these proceedings.

The vast majority of CSB's outstanding stock (96.8 percent at the time relevant to this appeal) was held by a two-bank holding company, Security Bankshares, Inc.[1] Security Bankshares, in turn, was owned by James L. Diamond, who owned forty percent of the stock, and Chester A. Long, who owned sixty percent of the stock. Prior to this acquisition, Long had been in the banking industry for eighteen years and had served as a bank examiner with the Federal Deposit Insurance Corporation and as president of Plaza National Bank and Home Savings and Loan Association in Bartlesville, Oklahoma. Diamond, a resident of Bartlesville, and Long became close friends and business associates after Long's arrival in Bartlesville.

On January 1, 1971, CSB obtained a contract of insurance entitled "Bankers Blanket Bond" from USF & G. The bond provided CSB with coverage up to $250,000 and insured CSB against "Loss through any dishonest or fraudulent act of any of the Employees...." The bond was renewed on January 1, 1980, for a three year period.

In February 1978, the then president of CSB resigned in order to become executive vice president at the competing Wellington State Bank. Concerned that CSB might lose much of its business to its competitor, Long determined that he should take the position as CSB's president. At approximately the same time, CSB's Board of Directors elected Diamond as vice president. Diamond was re-elected vice president in 1979 and 1980 but performed no substantial services in that office for CSB. Diamond, however, served on the Board of Directors of CSB from the time of the acquisition of his interest in Security Bankshares.

In the spring of 1979, Jerry McClure approached Long, Diamond, and Don Eve concerning a possible investment for manufacturing a luxury club car or van. The name chosen for the enterprise was Laser Manufacturing, Inc. ("Laser"). Long and Diamond had previously been involved in a similar enterprise with McClure called the Sportwagon. After inspecting a prototype for the Laser club car, Diamond decided to

---

1. In addition to CSB, Security Bankshares held 94.3 percent of the stock of Security State Bank in Hedley, Texas.

invest. On May 4, 1979, Laser was incorporated in Texas with Diamond, Long, McClure, and Eve as directors. Three of the four directors (i.e., Diamond, Long, and Eve) invested a total of approximately $130,000.00 in Laser. Further, an investment corporation owned by Diamond, known as the Bartlesville Investment Corporation, invested $7,500.00 in Laser and loaned Laser $120,000.00. Thus, Laser began its operations with a fund of approximately $250,000.00. Laser quickly exhausted its initial funding. In June 1979 Laser borrowed an additional $100,000.00 from a new source, the National Bank of Commerce in Dallas. Diamond, Eve, Long, and McClure co-signed the note.

In November 1979, Laser was again faced with a lack of funds. Moreover, no car had been produced for sale such that Laser was in a cashflow position. On November 20, Diamond and Eve arranged a line of credit for Laser with another source, the Union Bank & Trust ("UBT") of Bartlesville. Long was authorized to draft on this line of credit as Laser required the funds up to an amount of $150,000.00. Upon being informed of Laser's needs, Long would draw the money out of UBT and send it on to Laser's account at National Bank of Commerce. On March 14, 1980, Laser executed a promissory note for a floorplan loan of $100,000.00 with yet another institution, the First Bank & Trust of Richardson. Diamond, along with the other Laser directors, signed the note.

After the $150,000.00 line of credit at UBT had been exhausted on February 4, 1980, and during the negotiations for the floorplan loan, Long engaged in a series of actions which the district court termed as "draft kiting." Although the $150,000.00

line of credit at UBT had been exhausted, Long continued to submit drafts against it. In all, Long sent approximately $120,000.00 worth of excess drafts to UBT for payment; each draft was returned unpaid. Long, however, had CSB provide a credit for each draft and transferred the credit to Laser's account at National Bank of Commerce. UBT president Donaldson testified that he suspected a draft kiting scheme when Long submitted drafts identical to ones UBT had previously refused. Donaldson also testified that he believed that he had discussed the draft kiting with Diamond and that Diamond appeared concerned.

Long's efforts to fund Laser through CSB continued into May of 1980. On May 6, Long, without Diamond's knowledge or consent, signed Diamond's name to a promissory note with CSB in the amount of $175,000.00. Long used $120,000.00 of the note's proceeds to cover the overdraft of the line of credit with UBT. The remaining proceeds went to Laser's account at National Bank of Commerce. The note was submitted to CSB's Board of Directors on June 26, 1980, and approved by the directors attending the meeting. Although the minutes of the meeting indicated that Diamond was present, the district court found that Diamond did not attend the meeting. Throughout the summer, Diamond continued his involvement with Laser, including attending a car show in California with Long on May 28 and visiting the Laser facility in Richland Hills. By August 1980, however, Laser was near its end, and during the summer of 1980, Diamond determined to cease his involvement with Laser.[2]

**2.** Long continued to attempt to draft funds from Diamond and Eve. In October of 1980, Long drew two drafts on UBT accounts—$51,644.09 on Diamond's personal account and $43,141.24 on Eve's personal account. UBT mistakenly paid the drafts, and the district court found that the money went to Laser. After the error was discovered, UBT refunded the money to Diamond's and Eve's personal accounts. UBT president Donaldson, however, requested Diamond and Eve to sign guaranties for the money but

orally assured them that UBT would not call on them for payment. Long signed a note in Security Bankshares Inc.'s name to replace Diamond's and Eve's guaranties.

The district court noted Long's activity in sending the drafts on Diamond's and Eve's personal accounts at UBT. The district court, however, found that this activity did not indicate any dishonesty on Long's part since the drafts plainly indicated that Long was signing for Diamond and Eve.

On November 6, 1980, and on May 6, 1981, Long again, without Diamond's knowledge or consent, signed Diamond's name to a renewal of the $175,000.00 promissory note. On May 29, 1981, CSB sold a $90,000.00 participation interest in the note as renewed to Amarillo National Bank ("ANB"). When the note became overdue, ANB contacted Long, who assured ANB that the note would be paid. When Diamond was contacted about the note, Diamond denied any knowledge of it. Diamond was concerned because he had told the Texas State Banking Commissioner at the time he acquired Security Bankshares that he would not borrow from either of its member banks. After consulting with his attorneys, Diamond reported the note to the Texas State Banking Commissioner.

The Banking Commissioner summoned Long and Diamond to Austin in late September 1981. Long was ordered to resign from CSB and did so at a meeting of CSB's Board of Directors on September 27, 1981.[3] Shortly thereafter, Long assigned his entire interest in Security Bankshares Inc. to Diamond.

On April 16, 1982, ANB filed a civil action against CSB, Long, and Diamond in state court in order to recover its $90,000.00 participation interest in the $175,000.00 promissory note. The case was settled on December 19, 1983. As part of the settlement, Diamond and CSB posted an irrevocable letter of credit to ANB. At trial, Diamond explained that, while both he and CSB were obligated to pay the letter of credit, Diamond would pay it if CSB's capital reserves were too low to permit CSB to contribute any money to pay the letter of credit. Noting this evidence, the district court in the instant case found that any recovery by CSB from USF & G would be used to reduce Diamond's obligations under the letter of credit.

In late 1981, Laser went out of business. Diamond's investment company, Bartlesville Investment Corporation, foreclosed its

security interest in Laser's assets and sold them at public auction on January 19, 1983. On June 5, 1984, Long pleaded guilty to an indictment for forgery for signing Diamond's name to the May 6, 1980, note to CSB.

CSB initiated the instant suit to recover on the Banker's Blanket Bond. Following a trial to the court on August 16–22, 1984, the district court granted judgment for defendant USF & G. The district court based its judgment on three independent grounds relevant to this appeal. First, the district court held that Long was not an "employee" covered under the terms of the bond. Second, the district court held that recovery for losses suffered as a consequence of the two renewals was barred because the bond was terminated in 1980 due to Diamond's knowledge of Long's dishonest acts in funnelling money to Laser through CSB. Third, the district court held that allowing any recovery on the bond was equitably barred because it would result in a double benefit to Diamond.

CSB has the heavy burden of demonstrating that the district court erred in each of these three grounds. This Court's examination, governed by Texas law, focuses on the latter two grounds. The Court reserves the question whether Long was an "employee" under the terms of USF & G's bond.

## II. THE MERITS

The district court found that Diamond, who was a principal stockholder, director and officer of CSB and a principal investor in Laser, knew that Long was funnelling money to Laser through CSB. Specifically, the district court found:

> Diamond was the mover and shaker behind Laser, sinking hundreds of thousands of his own dollars into an attempt to get it going. Diamond and Long used CSB as a conduit for funding Laser.

. . . . .

3. The minutes noted, "[D]uring the meeting it was explained to the Board of Directors by C.A. Long that the $175,000 loan in favor of City State Bank in the name of J.L. Diamond was in fact not signed by J.L. Diamond and therefore not a valid note."

In view of his close association with Long ("one of my best friends"), his substantial investment in Laser, and his continued involvement in Laser for nearly a year afterwards, Diamond's testimony that he neither knew nor asked where the funds to sate Laser's voracious financial appetite came from after May, 1980, is not credible. If Diamond did not know, it is only because he deliberately closed his eyes, an act sufficient to charge him with knowledge.

Conclusions of Law Nos. 33, 34. The district court found Diamond's knowledge relevant in two ways: (1) such knowledge terminated coverage under Section 11 of the bond; and (2) such knowledge was relevant in that principles of equity barred allowing recovery on the bond since any payment by USF & G on the bond would go to Diamond. CSB attacks both of these bases for the trial court's judgment.

A. *Section 11 of the Bond; Diamond's Knowledge of Long's Activity*

██ The district court held that recovery under the bond for losses suffered as a consequence of the two renewals of the forged promissory note was barred "because the bond was terminated as to Long before the first renewal due to Diamond's knowledge of Long's dishonest and fraudulent acts." Conclusion of Law No. 38. The trial court's conclusion was based on Section 11 of the bond which provides:

This bond shall be deemed terminated or canceled as to any Employee—(a) as soon as the Insured shall learn of any dishonest or fraudulent act on the part of such

**4.** The district court held that CSB gave prompt notice of the loss resulting from Long's forging of the Diamond promissory note. CSB argues that this holding contradicts the court's later holding that the bond was terminated as to Long because of Diamond's knowledge of Long's dishonest acts in the draft kiting scheme. We find no merit to this argument since the district court considered only Long's knowledge of Long's own acts in determining whether CSB had given prompt notice. The district court correctly concluded that Long's knowledge could not be imputed to CSB since Long acted adversely to the interest of CSB in forging Diamond's name on the promissory note.

Employee, without prejudice to the loss of any Property then in transit in the custody of such Employee....

CSB contends that the district court erred in applying Section 11 so as to defeat its claim on the fidelity bond. CSB provides several arguments to support its contention.

The first is that the district court "applied an incorrect legal standard ... [in determining that] Diamond had knowledge of Mr. Long's dishonest and fraudulent acts prior to the November 6, 1980 renewal of the forged note." CSB Brief at 15. Particularly, CSB argues that the language of the bond requires an "actual knowledge" standard while the trial court applied only a "constructive knowledge" test.

Courts have discussed whether an insured "learns" or "discovers" a fraudulent act in the context of bond provisions requiring the insured to give the insurer prompt notice after discovery of a fraudulent or dishonest act. These cases are helpful in determining whether the insured has learned of an employee's dishonest or fraudulent act so as to terminate coverage as to that employee under bond provisions similar to Section 11.[4] In determining when an insured is required to give notice, this Court has noted the "well-established rule ... that the Insured ... is not bound to give notice 'until he [has] acquired knowledge of some specific fraudulent or dishonest act.' " *FDIC v. Aetna Casualty & Surety Co.,* 426 F.2d 729, 739 (5th Cir. 1970) (applying Texas law) (quoting *American Surety Co. v. Pauly,* 170 U.S. 133, 144, 18 S.Ct. 552, 556, 42 L.Ed. 977 (1898)).

Further, although we note that the analysis of when a party "discovers" an employee's dishonesty is helpful in interpreting provisions like Section 11, it cannot be said that the considerations underlying each are identical. One court, for instance, has recently noted that the purpose of notice provisions is to "permit[ ] the insurer to investigate the facts on which the claim is predicated and to adjust its books in order to maintain a proper reserve fund in light of the insured's claim." *Utica Mutual Insurance Co. v. Fireman's Fund Insurance Companies,* 748 F.2d 118, 121 (2d Cir.1984).

This Court has also emphasized, "Notice is not required when the obligee merely suspects or has reason to suspect the wrongdoing." *Id.* Courts, however, have not been uniform in whether the knowledge which the insurer must show as a defense should be considered "actual" or "constructive." [5] Despite this difference in labeling the type of knowledge required, the cases indicate that the insured cannot be required to act on "mere suspicion" and that the insured's subjective knowledge should at least be considered. *See Utica Mutual Insurance Co. v. Fireman's Fund Insurance Companies,* 748 F.2d 118, 123 (2d Cir.1984). *See also Central Progressive Bank v. Fireman's Fund Insurance Co.,* 658 F.2d 377, 380 (5th Cir.1981) (applying Louisiana law to construe provision similar to Section 11). Indeed, a recent Texas court decision adopted a similar approach. In *Fidelity & Casualty Co. of New York v. Central Bank of Houston,* 672 S.W.2d 641 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.), the court held that the jury's finding that the insured had discovered dishonesty by the employee should be upheld where the insured "had knowledge of facts from which [the insured] could have reasonably inferred that [the employee] DeLorenzo had acted dishonestly in connection with the Jackson loans." *Id.* at 644.

CSB argues that the district court applied an improper standard since the trial court stated that, "If Diamond did not know, it is only because he deliberately closed his eyes, an act sufficient to charge him with knowledge." Conclusion of Law No. 34. CSB also points to the district court's denial of a motion for new trial in which the district court, paraphrasing directly *Central Bank of Houston,* stated,

"Texas law . . . requires only that Diamond had knowledge of facts from which he could have reasonably inferred that Long had acted dishonestly." Record Vol. III at 587. These statements, when read alone, might lead to the concern that the district court required Diamond to act on mere suspicion. However, when the opinion is read as a whole, it appears that the district court, consistent with *Central Bank of Houston,* noted the facts in evidence and drew conclusions regarding Diamond's knowledge based on the evidence and the court's observance of the witnesses. At trial, for instance, USF & G asserted that Glenna Hernandez, CSB's cashier, knew of the $120,000.00 in draft kiting before the May 6, 1980, note was executed. The district court noted, "The drafts involved were so 'unusual, remarkable and clearly adverse' to CSB's interests that knowledge of some fraud, or dishonesty could be imputed to Hernandez and, thus, to CSB. . . ." However, the district court held that it would not draw the inference that Hernandez had such knowledge since the district court found "her testimony that she never suspected any wrongdoing to be credible." Conclusion of Law No. 25. In contrast, the district court made a different finding with respect to Diamond. The trial court stated, "Crucial to the resolution of this case, however, is whether Diamond knew that Long was sending money to Laser from CSB over Diamond's signature. The answer can only be yes." Conclusion of Law No. 34. Further, the trial court explicitly rejected Diamond's testimony that he did not know nor ask the source of Laser's financial appetite. Thus, we conclude that the district court adopted a legal standard fully

---

5. Indeed, a leading treatise in insurance law notes the disparity in the approach:

It is sometimes generally stated that the insured is required to give notice when he either knows or ought to know of the facts which may form the basis of a claim against the insurer. The requirement is also stated on the basis that the question is whether the insured acquired knowledge of facts from which he might reasonably conclude that the employee had been committing fraudulent

and dishonest acts, and that to give rise to the duty to notify the insurer it is necessary that the insured have knowledge of the employee's default, whether express or implied, from actual or inferential facts. And again it is stated flatly that an employer is only required to notify the surety of facts actually coming to his knowledge. . . .

13A R. Anderson & M. Rhodes, *Couch on Insurance 2d* § 49:232 (1982) (citations omitted).

consistent with the jurisprudence in this area.

CSB also contends that, even if the trial court applied the correct legal standard, Diamond had no knowledge of any fraudulent or dishonest acts of Long prior to September 1981. The trial court's determination that Diamond had such knowledge is a question of fact subject to the clearly erroneous rule. *See* Fed.R.Civ.P. 52(a); *Central State Progressive Bank v. Fireman's Fund Insurance Co.*, 658 F.2d 377, 380–81 (5th Cir.1981).

Diamond's knowledge of Long's fraudulent acts focuses on Long's draft kiting on Laser's line of credit with UBT. CSB concedes that Diamond knew that the drafts were submitted to UBT for payment by Long but points out that Long's mere submission of drafts to UBT did not constitute fraudulent activity. Rather, CSB argues, Long's activity was only dishonest because Long created an immediate credit for each draft and caused the funds to be transferred from CSB to Laser's account at National Bank of Commerce. CSB concludes that Diamond could not have known of Long's activity in posting such credits and therefore did not even have the opportunity to acquire knowledge of any dishonest activity by Long. As the district court pointed out, however, Diamond had the advantage of knowing not only that Long was submitting drafts but also that money was flowing into Laser since Diamond continued to receive financial reports regarding Laser. Further, UBT president Donaldson testified that he suspected a draft kiting operation and indicated that he so told Diamond. He testified that Diamond appeared concerned. Moreover, Diamond received copies of deposit slips dated from April 25, 1980, to May 6, 1980, which indicated money flowing into Laser's account "from City State Bank, Wellington by order of J.L. Dia-

mond." Record Vol. VI at 500–01; Defendant's Exhibit 98. While Diamond testified that he received these deposit slips sometime after May 1980, the slips were grouped together in Diamond's files with Laser's May 1980 budget. *Id.* at 503.[6] The district court also noted Diamond's close association with Long. From this evidence, it cannot be said that the district court clearly erred in rejecting Diamond's self-serving testimony that he did not know the source of Laser's "voracious financial appetite." Conclusion of Law No. 34.

CSB argues that, even if Diamond had knowledge of Long's dishonest activity, such knowledge should not be imputed to CSB. Diamond was not only a principal stockholder of CSB's holding company but was also a director and its vice president from 1978 through 1980.[7] Under such circumstances, the district court did not err in imputing Diamond's knowledge to that of CSB, which, as a corporation, can acquire such knowledge only through its agents. *See International Bankers Life Insurance Co. v. Holloway*, 368 S.W.2d 567, 580 (Tex.1963). In Holloway, former officers of the corporation were charged with wrongdoing. One issue in Holloway was when the corporation learned of this wrongdoing. The Texas Supreme Court stated:

> [N]otice to an officer or agent is notice to the corporation in the circumstance where the officer or agent in the line of his duty "ought, and could reasonably be expected, to act upon or communicate the knowledge to the corporation." ... The office of a corporation director or officer is more than nominal, and those assuming the duties and responsibilities of such offices are not justified in neglecting every precaution or investigation; it is their minimal duty and responsibility to protect the corporation against acts adverse to the interest of the corporation,

Record Vol. VI at 504.

---

**6.** The district court was well justified in rejecting Diamond's shaky testimony that he had received the records only later. For instance, Diamond testified on cross-examination:

> Q: You just don't know. You might have got them [the deposit slips] in May of 1980.
> A: I don't think so.

**7.** Texas law requires a bank to elect three officers: a president, vice president, and cashier or secretary. Tex.Rev.Civ.Stat.Ann. arts. 342–409, 410 (Vernon Supp.1985).

whether perpetrated by fellow directors or by strangers to the corporation. 368 S.W.2d at 580. Similarly, Diamond's duty to CSB as officer and director makes his knowledge imputable to the bank.[8] *See also Continental Oil Co. v. Bonanza Corp.,* 706 F.2d 1365, 1376 (5th Cir.1983) (en banc) (whether knowledge of individuals should be imputed to corporation "must be discerned from the circumstances of each case").

Thus, CSB's arguments fail to persuade that the district court erred in holding that Section 11 of the bond bars CSB from recovering for any losses resulting from the two renewals of the forged promissory note.[9]

### B. *Equitable Considerations*

The trial court also held that principles of equity barred CSB from recovering any losses on the bond with USF & G. This Court has recognized the application of such equitable principles. In *FDIC v. Lott,* 460 F.2d 82 (5th Cir.1972) (applying Texas law), for instance, the insurer argued that the bank was barred from recovering on a fidelity bond since the bank sought recovery for fraudulent acts of its president and majority stockholder. The insurer argued that, since the bank president was in sole control of the bank, the bank president should not be allowed to insure himself against his own fraud. 460 F.2d at 87. The Court agreed that "one in sole control of the bank should not be allowed to insure himself and profit from his own fraud." *Id.* The Court, however, held that this principle did not apply in *Lott* because the district court had tailored its judgment specifically to exclude the bank president from participating in any recovery on the bond.

*Id.* at 87 & n. 5. Significantly, the Court also noted:

> The jury's verdict also forecloses [the insurer] Aetna's assertion that it would be contrary to equitable principles to permit these directors to profit from their neglect of duties which brought about the losses to the bank. In their answers to special interrogatories the jury categorically found that none of the other directors knew of Long's dishonest acts nor was their ignorance a proximate cause of the bank's losses.

*Id.* at 88. *See also Fidelity & Casualty Co. v. Central Bank of Houston,* 672 S.W.2d at 647.

██ In the instant case, the district court noted several factors which led to its conclusion that recovery on the bond was equitably barred. Foremost was Diamond's knowledge of Long's dishonest activity. Conclusion of Law No. 34. Thus, unlike *Lott,* in which the factfinder found that other agents of the bank had no knowledge of the wrongdoing, the district court found that Diamond did indeed have such knowledge. Further, Diamond, a principal founder and investor in Laser—at least potentially—benefitted from the infusion of capital into Laser from the $120,000.00 in draft kiting engineered by Long. As the district court noted:

> While Diamond consistently described CSB as "Long's deal," he held nearly 40% of the stock beneficially. Diamond was the mover and shaker behind Laser, sinking hundreds of thousands of his own dollars into an attempt to get it going. Diamond and Long used CSB as a conduit for funding Laser. In the spring of 1980, Diamond told Long to "get [Laser] going or get me out."

---

**8.** CSB's reliance on *Luling Oil & Mfg. Co. v. Lane & Bodley Co.,* 49 Tex.Civ.App. 534, 109 S.W. 445 (1908), is unpersuasive in that the court there specifically held no such duty arose.

**9.** We note that the district court's holding regarding Section 11 of the bond reaches only losses resulting from the renewals of the forged promissory note. While a remand might be

necessary if this Court affirmed only on this single ground in order to inquire whether CSB suffered loss prior to the renewals, no such remand is necessary in the instant case since our holding affirms the district court's independent ground that any recovery on the bond is equitably barred.

Shortly thereafter, Long forged the May 6, 1980, note. While Diamond testified that he had decided before May, 1980, to pull out of Laser, i.e., to stop putting money in, he participated in operating Laser until the summer of 1980.... Diamond would have been cut in for a large slice of the pie if Laser had started turning a profit.

Conclusion of Law No. 33. Further, no attempt was made to exclude Diamond as a principal stockholder from recovery, as was the case in *Lott*. Rather, although some local persons in the Wellington area had invested in CSB since Long's resignation, the purchase agreement specifically provides that "the previous shareholders [i.e., Diamond] would receive all the benefits from any payment of a bond claim." Testimony of Richard Fourmention, Record Vol. V at 172. Moreover, the record also revealed that any payment on the bond would go toward reducing Diamond's obligation on the letter of credit that Diamond and CSB obtained to settle the suit with Amarillo National Bank. Record Vol. VI at 450–51, 522. As the district court summarized, Diamond, who paid the attorney's fees in the instant case, "is arguably the real party in interest here [although] CSB could realize some benefit from recovery by being relieved of its joint obligation with Diamond under the letter of credit. CSB, [however], is essentially wholly owned by Diamond." Conclusion of Law No. 35. Thus, unlike the case in *Lott* where the judgment was specifically tailored to avoid violation of equitable principles, the district court here correctly decided that equitable principles barred Diamond from recovering through CSB on the fidelity bond.

### III. CONCLUSION

Thus, we conclude that the district court did not err in holding that recovery on the fidelity bond was barred by Section 11 of the bond and by principles of equity. The judgment of the district court is

AFFIRMED.