655 F.2d 743
 Lillian Lincoln HOWELL and Lincoln Television, Inc.,
Plaintiffs-Counter-Defendants-Appellants,
v.
CONTINENTAL CREDIT CORP., and The Drovers National Bank of
Chicago, Defendant,
and
The Federal Deposit Insurance Corporation,
Defendant-Counter-Plaintiff-Appellee.
 No. 80-1566.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 16, 1981.
Decided July 17, 1981.
 
 Carol R. Thigpen, Jenner & Block, Chicago, Ill., for plaintiffs-counter-defendants-appellants.
 Robert C. Knuepfer, Asst. U. S. Atty., Chicago, Ill., for defendant-counter-plaintiff-appellee.
 Before FAIRCHILD and PELL, Circuit Judges, and SPEARS, Senior District Judge.*
 PELL, Circuit Judge.
 
 
 1
 This case arises from a highly complex but not well-managed financial transaction through which the Federal Deposit Insurance Corporation (FDIC) became the purported lessor of various items of equipment to appellant Howell as lessee. The FDIC is now claiming the amounts due under the leases and the appellants defend on the ground that the original lessor, Continental Credit Corp. (Continental) failed to provide adequate consideration. The district court granted summary judgment in favor of the FDIC dismissing the appellants' complaint on the ground that the leases did not explicitly require Continental to furnish the consideration appellants now claim. It concluded, therefore, that any agreement requiring such consideration must have been a "secret agreement," and thus held, relying upon 12 U.S.C. § 1823(e) and D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), that the agreement was not binding upon the FDIC. Howell has appealed the district court's summary judgment that the leases were enforceable against her.
 
 
 2
 * Lillian Lincoln Howell is the sole shareholder of Lincoln Television Inc., (Lincoln) also an appellant, a California corporation licensed to operate a television station in San Francisco, California.[1] In 1974, Mrs. Howell determined the need for various broadcasting equipment to be used by Lincoln and on October 11 of that year, she placed orders with RCA for more than $856,000 worth of equipment. RCA required a down payment of 2% of the total amount ordered, and a down payment of up to 35% for some of the custom-made equipment, to be submitted with the orders. RCA also required an irrevocable letter of credit from appellant in favor of RCA for an amount sufficient to cover the full unpaid balance of the purchase price plus sundry other costs and expenses. By the beginning of 1976, appellant had paid RCA a total of $280,000 and furnished a $500,000 letter of credit.
 
 
 3
 Although the exact date of the decision is open to question, sometime during the occurrence of these events appellant became aware of the tax advantages to be gained by structuring her acquisition of the equipment as a lease as opposed to a purchase. On March 1, 1976, therefore, appellant and Continental entered into a lease of the equipment with Continental serving as lessor and appellant as lessee. The precise rationale behind appellant's putting herself in the unfortunate position of being both the lessee and the purchaser of the same equipment has eluded this court. It does appear that in order for Continental to be able to purchase the equipment, it required a bank loan and the signed leases were needed to serve as collateral. There seems little question, however, that the parties intended Continental to acquire title to the equipment in order to lease the equipment to Howell. Eventually, Continental did discount the leases with the Drovers National Bank in Chicago, Illinois (Drovers) and assigned all of its rights under the leases in return for more than $900,000 to be used to purchase the equipment. To secure her performance under the leases, appellant pledged over $1 million worth of common stock which she deposited in an escrow account with Drovers.
 
 
 4
 For awhile, the transaction progressed as the parties had planned and Continental used some of the proceeds from Drovers to purchase some of the equipment. It soon became clear, however, that Continental was using the bulk of the money for its own benefit elsewhere. Although Continental had placed purchase orders with RCA for the equipment already ordered by Howell and had instructed RCA to bill it directly for the amounts due, RCA apparently never acknowledged nor accepted these orders. In any event, Continental never paid RCA for the $856,000 worth of equipment covered by the leases at issue in this case. As a result of this failure, RCA began to draw upon appellant's letter of credit. Appellant authorized payment under the letter of $316,778.30 on March 11, 1976, ten days after she had executed the leases in favor of Continental. RCA withdrew a further $108,221.70 on April 15, 1976, two days after Continental had received the proceeds from the discounting to Drovers.
 
 
 5
 In spite of the fact that appellant was aware that RCA was drawing upon her letter of credit, she began payment of the rentals due under the leases to Drovers. Appellant paid the May and June 1976 rentals, but refused to pay the July rental after notifying Drovers of Continental's failure to purchase the equipment. Appellant claimed that Continental's acquisition of title to the equipment was required under the leases and that the failure to do so was a failure to provide consideration for the rental payments. As a result of appellant's failure to pay the rentals, Drovers seized the stock it was holding in escrow. Appellant then initiated this action to secure the stock's return and to have the leases determined to be void.
 
 
 6
 In the ensuing litigation, both parties filed motions for summary judgment which were denied. Appellant claimed that the leases were invalid because Continental had failed to obtain ownership of the equipment. Drovers relied upon a clause in the leases stating that appellant waived the right to assert against Continental's assignee any defense she might have against Continental. The court denied the motions on August 25, 1977, because it found, inter alia, that there was a genuine issue of material fact as to whether the bank took the assignment with notice of appellant's defenses. Under the Uniform Commercial Code as codified in Ill.Rev.Stat. ch. 26 § 9-206(1), such notice would have precluded Drovers from enforcing the waiver clause. Regarding the duty of Continental to acquire title to the equipment, the court stated:
 
 
 7
 The lease is written in standard boiler plate language and does not specifically define Continental's obligations with respect to the purchase of the equipment from the vendors (RCA). It is evident that there was some agreement, presumably oral, between Continental and Howell whereby Continental would obtain title to the equipment it was leasing to the plaintiffs.
 
 
 8
 This daedalian situation was further confused on January 19, 1978, when the Comptroller of the Currency determined that Drovers would no longer be able to meet its obligations to depositors. Accordingly, he declared Drovers insolvent and appointed the FDIC as receiver. The FDIC consequently executed a purchase and assumption transaction which consisted of two agreements. Under the first agreement, the FDIC transferred Drover's deposit liabilities, $130,000,000 in cash, and a low-risk installment loan portfolio to a new bank, The Drovers Bank of Chicago, which paid a $3,125,501 premium for the value of the ongoing business. Pursuant to the second agreement, the FDIC as receiver transferred all of Drover's assets which were not readily marketable to the FDIC in its corporate capacity. Included among these assets was the "substandard" loan portfolio containing the Howell leases.
 
 
 9
 After being allowed to intervene in the present litigation, the FDIC counterclaimed against appellant contending that the leases were valid and enforceable according to their terms, and moved for summary judgment. The FDIC's motion claimed that appellant was estopped to defend against the FDIC upon her claims against Continental under D'Oench, supra and § 1823(e). On October 16, 1979, the district court granted the motion relying upon its prior factual finding that the leases contained no explicit obligation of Continental to obtain title to the equipment, and that any such obligation could only have been contained in a "secret agreement" which both D'Oench and § 1823(e) made unenforceable against the FDIC.
 
 II
 
 10
 In D'Oench, the plaintiff executed a note in favor of a bank in order to deceive a state bank examiner by falsely inflating the bank's assets. The maker and the bank had a separate agreement whereby the bank would not seek to enforce the note. This agreement, however, was not recorded in the bank's records for obvious reasons. A year later, in 1934, the FDIC was formed and relied upon the state bank examiner's sanction in granting insurance protection to the bank. In 1938, the bank required a loan from the FDIC to remain solvent, and the Corporation acquired the plaintiff's note as collateral for the loan. When the bank finally did fail, the FDIC sought to enforce the note and the plaintiff protested upon the basis of the separate agreement and upon the ground that the note had been issued without adequate consideration. The Supreme Court held that the note was enforceable in the hands of the FDIC. Finding that the plaintiff was equitably estopped to defend upon the ground of the separate "secret" agreement, the Court applied the well-established rule disallowing an individual to profit from or defend upon the basis of his own wrongful act. Justice Douglas speaking for the Court noted:
 
 
 11
 If the secret agreement were allowed as a defense in this case, the maker of the note would be enabled to defeat the purpose of the statute by taking advantage of an undisclosed and fraudulent arrangement which the statute condemns and which the maker of the note made possible.
 
 
 12
 315 U.S. at 461, 62 S.Ct. at 681.
 
 
 13
 In 1950, the Congress codified the rationale of D'Oench in 12 U.S.C. § 1823(e) which provides in pertinent part:
 
 
 14
 No agreement which tends to diminish or defeat the right, title or interest of the Corporation (FDIC) in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.
 
 
 15
 Both D'Oench and § 1823(e) have been applied numerous times to effectuate the public policy interest in not enforcing "secret agreements" against the FDIC when it is carrying out its statutorily-mandated duties to protect depositors. Although the individuals held liable for the amounts due to the FDIC are rarely guilty of misconduct similar to that addressed in D'Oench, in these cases the FDIC has been able to avoid the terms of any agreement not properly recorded in the bank's records. See, e. g., FDIC v. Hoover-Morris Enterprises, 642 F.2d 785 (5th Cir. 1981); FDIC v. First National Finance Corp., 587 F.2d 1009 (9th Cir. 1978); FDIC v. Alker, 164 F.2d 469 (3d Cir. 1947), cert. denied, 334 U.S. 827, 68 S.Ct. 1337, 92 L.Ed. 1755; FDIC v. Rosenthal, 477 F.Supp. 1223 (E.D.Wis.1979), aff'd, 631 F.2d 733 (7th Cir. 1980); FDIC v. Timonen, No. 77 C 1389 (N.D.Ill., June 16, 1978); FDIC v. Bennett, No. 76 C 2602 (N.D.Ill., June 18, 1978); FDIC v. C&A Carbone, Inc., No. 77 Civ. 1191 (S.D.N.Y., April 13, 1978); FDIC v. Malamis, No. 77 C 1461 (N.D.Ill., Dec. 22, 1977); FDIC v. Lakeshore Financial Corp., No. 76 C 467 (E.D.Wis., Nov. 3, 1977); British Columbia Investment Co. v. FDIC, 420 F.Supp. 1217 (S.D.Cal.1976); FDIC v. Disterdoft, No. 144-161 (Cir.Ct.Wis., Dec. 29, 1977); FDIC v. Alward, No. 144-156 (Cir.Ct.Wis., Dec. 5, 1977); FDIC v. Slabaugh, No. 144-180 (Cir.Ct.Wis., Dec. 5, 1977). In all of these cases, however, the FDIC was seeking to enforce a facially valid note or guarantee imposing a unilateral obligation on the maker to pay a sum certain amount to the bank. As stated previously, the makers' defenses were founded entirely upon separate and undisclosed agreements. We believe these holdings are inapplicable, therefore, where the document the FDIC seeks to enforce is one, such as the leases here, which facially manifests bilateral obligations and serves as the basis of the lessee's defense. In these situations, we do not believe the lessee should be held liable automatically simply because the FDIC has become a belated party to the transaction.
 
 
 16
 The leases here involved clearly manifest the bilateral nature of the lessee's and lessor's rights and obligations. Regarding Continental's obligation to acquire title to the equipment, the leases set forth this obligation both directly, such as in paragraph 13:
 
 
 17
 13. Title To Equipment As Personal Property.... The Equipment shall always remain and shall be admitted to be personal property ... and the title thereto shall remain in Lessor exclusively....
 
 
 18
 and indirectly, such as within the definition of "actual costs" from which the rental payments were computed. The definition provides: " 'Actual Costs' means the cost to Lessor of purchasing and delivering the Equipment to Lessee...." This is not a case such as D'Oench and its progeny where the maker's defense depended solely upon a secret or unrecorded agreement, usually oral, of which the FDIC could have had no notice. The defense appellant posits here arises directly and explicitly from the provisions of the leases which were in the bank's files and which the FDIC now seeks to enforce. We have not been presented with any persuasive reason why appellant's defense should not at least be tested at trial. Rather, we agree with the statements made in Riverside Park Realty Co. v. FDIC, 465 F.Supp. 305, 313 (M.D.Tenn.1978), where the court in addressing a very similar situation stated:
 
 
 19
 When the enforcement of a separate collateral or secret agreement would alter the terms of an asset acquired by the FDIC so that the FDIC's right, title, or interest in the asset would be defeated or diminished, § 1823(e) comes into play. See, e. g., Federal Deposit Insurance Corp. v. Vogel, 437 F.Supp. 660 (E.D.Wis.1977); Dasco, Inc. v. American City Bank & Trust Co., 429 F.Supp. 767 (D.Nev.1977). The statute was enacted to effectuate a federal public policy to protect the funds of depositors in federally insured banks. "It operates to insure that the FDIC, when it expends moneys entrusted to it to purchase assets of a closed insured bank, can rely on the bank's records and will not be risking an impairment of the assets through an agreement not contained in the bank's records." Federal Deposit Insurance Corp. v. Vogel, supra, 437 F.Supp. at 663. Congress undoubtedly intended to cloak the FDIC with a significant amount of protection by promulgating § 1823(e), and accordingly the courts have repelled attempts of obligors on notes acquired by the FDIC who seek to prevent enforcement of the obligations by asserting separate, secret, unrecorded agreements. For example, in Federal Deposit Insurance Corp. v. Vogel, supra, the court held that in a suit by the FDIC against the guarantors of a letter of credit, the guarantors could not assert that their guaranties were given for the oral promise of the closed bank to loan the guarantors $2,000,000, which the bank failed to do; and in Dasco, Inc., supra, the court decided that the makers could not defeat the rights of the FDIC in a note by claiming the existence of an oral agreement between the parties that made the maker's liability on the note conditional.
 
 
 20
 When, however, the asset upon which the FDIC is attempting to recover is the very same agreement that the makers allege has been breached by the FDIC's assignors, § 1823(e) does not apply. None of the policies that favor the invocation of this statute are present in such cases because the terms of the agreement that tend to diminish the rights of the FDIC appear in writing on the face of the agreement that the FDIC seeks to enforce.
 
 
 21
 465 F.Supp. at 313.
 
 
 22
 The details of exactly how Continental was to acquire title,[2] and the remaining factual details of appellant's defense flagged on the face of the instrument are issues for trial, which might result in the conclusion that the defense is unavailable due to waiver clauses in the leases or evidence of contrary intent of the parties, or is otherwise insufficient to defeat the FDIC's claims. However, the fact that the court must go outside the leases to test the strength and validity of the defenses is not fatal where the foundation and basis of that defense is in a document arguably meeting the nonsecrecy requirements of § 1823(e). Furthermore, the fact that appellant "lent herself" to an incondite business transaction or sought certain legal tax advantages in her business dealings does not call for the application of the equitable estoppel discussed in D'Oench. See FDIC v. Meo, 505 F.2d 790 (9th Cir. 1974).
 
 
 23
 Summary judgment should be granted only when it is clear that there is no dispute about either the facts of the controversy or the inferences to be drawn from such facts. In this case, the district court granted summary judgment on the basis of a factual finding that the leases did not contain the manifestation of the agreement that Continental was to acquire title to the equipment. This was clearly erroneous. The resulting application of the D'Oench doctrine and § 1823(e) was thus in error. The judgment is therefore reversed and the case is remanded for further proceedings consistent with this opinion.
 
 
 24
 Reversed and Remanded.
 
 
 
 *
 Judge Adrian A. Spears, Senior District Judge of the Western District of Texas, is sitting by designation
 
 
 [1]
 Although Lincoln is also an appellant, the leases were in the name of Howell and our focus in this opinion is on her as the active participant in the transactions in question. Accordingly, the references in this opinion to the "appellant" refer only to her as any claims of Lincoln are only based upon Howell's claim
 
 
 [2]
 The district court noted that "It can be speculated that such an agreement (between Howell and Continental) would have required Continental to either pay the vendors directly or to reimburse Howell for any payments she may have made for the equipment