**FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff–Appellee,**

v.

**The AETNA CASUALTY & SURETY COMPANY, Defendant–Appellant,**

v.

**Jacob F. BUTCHER; Jesse A. Barr; and Lionel B. Wilde, Third–Party Defendants–Appellees.**

No. 90–5838.

United States Court of Appeals, Sixth Circuit.

Argued May 16, 1991.

Decided Oct. 10, 1991.

As Amended Jan. 24, 1992.

---

James R. Buckner, Marcia J. Meredith, Raymond R. Murphy, Jr., Miller & Martin, Douglas T. Johnson, Chattanooga, Tenn., John P. Parker (briefed), Richard J. Osterman, Jr., Federal Deposit Ins. Corp., Robert D. McGillicuddy (argued), FDIC, Washington, D.C., for FDIC.

Samuel L. Akers, William B. Luther, Shane Usary, Luther, Anderson, Cleary, Ruth & Speed, Chattanooga, Tenn., Larry L. Simms (argued and briefed), Michael B. Rappaport, Gibson, Dunn & Crutcher, Washington, D.C., for Aetna Cas. & Sur. Co.

Jacob F. Butcher, pro se.

Jesse A. Barr, pro se.

James S. Tipton, Jr., Gentry, Tipton, Kizer & Little, Knoxville, Tenn., for Lionel B. Wilde.

Before GUY and NELSON, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

RALPH B. GUY, Jr., Circuit Judge.

Defendant Aetna Casualty & Surety Company (Aetna) appeals from a jury verdict awarding $5,950,000 to the Federal Deposit Insurance Corporation (FDIC). Aetna had refused to make payment on a bankers blanket bond issued to the failed United American Bank (UAB) in Knoxville, Tennessee. The FDIC was the receiver for UAB and claimed entitlement to coverage and payment under the bond.

On appeal, Aetna argues that (1) the district court erred when it held that 12 U.S.C. § 1823(e) barred Aetna's misrepresentation and adverse agency defenses, (2) the district court erred when it barred Aetna's alter ego defense, (3) Aetna's motion for judgment notwithstanding the verdict should have been granted because of the overwhelming evidence Aetna presented to support its case, and (4) the district court gave an ambiguous jury instruction which was prejudicial. Upon review, we find that the district court improperly interpreted 12 U.S.C. § 1823(e), as it relates to Aetna's misrepresentation and adverse agency claims, and failed to apply Tennessee law to Aetna's alter ego defense. We reverse and remand on these issues.

## I.

UAB was operated and controlled by Jake F. Butcher and his brother, C.H. Butcher, Jr. Jake Butcher was the President, Chairman of the Board of Directors, and the largest shareholder of UAB. Un-

der his control, UAB engaged in unsafe and improper lending practices that eventually led to the bank's insolvency. Specifically, Jake Butcher concealed and misrepresented numerous loans that were for his or his family's personal benefit, forged loan documents, and misrepresented the existence and value of collateral for these loans.

Tennessee's banking commissioner assumed control of UAB on February 14, 1983. The FDIC was then appointed as a receiver and entered into a purchase and assumption agreement. Under the terms of this agreement, the First Tennessee Bank assumed all liabilities and certain assets from the FDIC as a receiver. Assets that were not assumed by First Tennessee, including UAB's claims under the bankers blanket bond, were transferred to the FDIC in its corporate capacity.

Before it dissolved, UAB purchased a bankers blanket bond, effective March 15, 1981, from Aetna with a $6,000,000 limit on liability and a $50,000 deductible. Bankers blanket bonds, which state banks are required to purchase under Tennessee law, generally provide insurance coverage for losses resulting from employee dishonesty, such as theft or fraud. UAB filed an application and provided other supporting documentation in order to obtain coverage. On the application, UAB was required to furnish information that would enable Aetna to evaluate the risks of coverage. Among other things, the application asked whether or not UAB was under investigation by either state or federal authorities in regard to its banking practices. Although UAB indicated that it was not under investigation, Aetna alleges that this information is untrue and provides some evidence to support this allegation. Aetna also alleges that the bank made several other misrepresentations in its application for the bond.

UAB purchased the bond through City and County Insurance (CCI). CCI acted as Aetna's agent in the transaction. CCI was owned and controlled by C.H. Butcher, Jr.

On December 24, 1985, the FDIC in its corporate capacity filed suit against Aetna seeking recovery under the bankers blanket bond. Aetna asserted several defenses. Aetna argued that because UAB made material misrepresentations in its application, the bond was therefore void as a matter of Tennessee law. The district court ruled that 12 U.S.C. § 1823(e) barred this defense.

Aetna also argued that an insurance contract never had been formed. CCI knew of UAB's misrepresentations but failed to inform Aetna. Thus, CCI acted as an adverse agent to Aetna and the contract was a nullity. The district court ruled that 12 U.S.C. § 1823(e) barred this defense as well because the defense depended upon an asserted oral condition to Aetna's obligation to pay under the bond.

Finally, Aetna argued that the Butchers exercised such dominant authority over UAB that they were UAB's alter ego. Because the bankers blanket bond insured UAB only against dishonest acts of its employees, if the Butchers were the alter ego of UAB, then Aetna would not be required to pay insurance benefits to cover losses as a result of the Butchers' actions. The district court struck this defense as well, based on prior case law.

The case was submitted to a jury and the jury rendered a verdict of $5,950,000 plus interest.[1] Aetna filed a motion for a judgment notwithstanding the verdict or, in the alternative, for a new trial. The district court denied the motion.

Aetna appealed.

## II.

The Tenth Circuit, in *Grubb v. FDIC*, 868 F.2d 1151 (10th Cir.1989), concisely outlined the role of the FDIC in handling the failure of a bank as follows:

When the FDIC serves as receiver of a failed bank, it may pay off the bank's depositors by two methods. The first is simply to liquidate the bank's assets and

---

1. Aetna states in its brief that the FDIC has agreed to limit the amount in dispute to $2.5 million.

pay the depositors their insured amounts, covering any shortfall with insurance funds. The FDIC tries to avoid this option, however, because it decreases public confidence in the banking system and may deprive depositors of the uninsured portions of their funds.

The second, and preferred, alternative is to initiate a "purchase and assumption" transaction (P & A). In this type of transaction, the FDIC as receiver arranges to sell acceptable assets of the failed bank to an insured, financially sound bank, which assumes all of the corresponding deposit liabilities and reopens the failed bank without an interruption in operations or loss to depositors. The FDIC as receiver then sells to the FDIC in its corporate capacity the assets that the assuming bank declined to accept. The corporate entity of the FDIC in turn attempts to collect on the unacceptable assets to minimize the loss to the insurance fund.

*Id.* at 1154–55 (citations omitted).[2] The present case involves a suit by the FDIC in its corporate capacity after it chose to initiate a purchase and assumption transaction.

As the Third Circuit observed in *FDIC v. Blue Rock Shopping Center, Inc.*, 766 F.2d 744 (3d Cir.1985), "[n]ot unexpectedly, FDIC's attempts to realize on such assets have been met by defenses which the obligor on the note has against the failed bank." *Id.* at 752.

**2.** One court noted the following additional disadvantages to liquidation: "[M]ost of the failed bank's employees lose their jobs, accounts are frozen and checks are returned unpaid to the drawer." *FDIC v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 630 F.Supp. 1149, 1153 (W.D.La. 1986).

**3.** The statute was amended effective August 9, 1989. Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183, 256 (1989). It previously read as follows:

No agreement which tends to diminish or defeat the right, title or interest of the Corporation in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an

In response to the flurry of defenses asserted against the FDIC in purchase and assumption transactions, the Supreme Court in *D'Oench, Duhme & Co., Inc. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), held that there was "a federal policy to protect respondent [FDIC], and the public funds which it administers, against misrepresentations as to the securities or other assets in the portfolios of the banks which respondent insures or to which it makes loans." *Id.* at 457, 62 S.Ct. at 679. The petitioner in *D'Oench* had argued that, at the time he made the note with the bank, the bank promised that it would not enforce the note. The Court held that this "secret agreement" could not be used as a defense, *id.* at 460, 62 S.Ct. at 680, because "it would tend to deceive the banking authorities." *Langley v. FDIC*, 484 U.S. 86, 92, 108 S.Ct. 396, 401, 98 L.Ed.2d 340 (1987).

The *D'Oench* doctrine was subsequently codified by Congress in 12 U.S.C. § 1823(e),[3] which provides:

No agreement which tends to diminish or defeat the interest of the Corporation [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation [FDIC] unless such agreement—

(1) is in writing,

adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.

A comparison of both statutes reveals the following changes: the explicit application of the statute to the FDIC in its capacity as a receiver, the change from paragraph to clause form, and the change in tenses. Additionally, the phrase "right, title or interest" was changed to "interest" under the new law. Neither party argues that these amendments, which became effective during the litigation of this case, have any bearing on the outcome.

(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(4) has been, continuously, from the time of its execution, an official record of the depository institution.

Aetna argues that 12 U.S.C. § 1823(e) does not bar its misrepresentation defense. The district court, however, held that the application for the bond did not meet the requirements of section 1823(e). It held that to satisfy section 1823(e)'s requirements for an exception, the board had to approve the misrepresentations on the application specifically; that is, the board must have been aware that the agreement contained fraudulent misrepresentations made by the bank and the board must have effectively endorsed those misrepresentations in its minutes. We disagree. The district court relied in part on the Supreme Court's decision in *Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987). Because the district court and both parties, to some extent, rely on *Langley*, we will discuss it and use it as a starting point for our analysis of the facts before us.

In *Langley*, the petitioners had purchased some property, which was financed through a loan from a savings bank. In consideration of the loan, the Langleys executed a note, a collateral mortgage, and personal guarantees. The Langleys stopped paying on the loan and the bank filed suit. The Langleys alleged that the land purchase and the notes were procured through misrepresentations regarding the total type and acreage of the land and the existence of mineral leases on the land. No references to these representations appeared in the documents executed by the Langleys, the bank's records, or in the minutes of the bank's board of directors or

loan committee meetings. The bank that issued the loan subsequently failed and the FDIC, in its corporate capacity, substituted itself for the bank in the suit. The Supreme Court framed the issue before it as whether "§ 1823(e) bars the defense that the note was procured by fraud in the inducement even when the fraud did not take the form of an express promise." 484 U.S. at 90, 108 S.Ct. at 400. The Supreme Court ultimately held that "[a] condition to payment of a note, including the truth of an express warranty, is part of the 'agreement' to which the writing, approval, and filing requirements of 12 U.S.C. § 1823(e) attach. Because the representations alleged by petitioners constitute such a condition and did not meet the requirements of the statute, they cannot be asserted as defenses...." *Id.* at 96, 108 S.Ct. at 404.

Before reaching its conclusion, the Supreme Court discussed the history and policies prompting the enactment of section 1823(e). The Supreme Court noted that one of the primary purposes of section 1823(e) is "to allow federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets. Such evaluations are necessary when a bank is examined for fiscal soundness by state or federal authorities ... and when the FDIC is deciding whether to liquidate a failed bank ... or to provide financing for purchase of its assets ... by another bank...." *Id.* at 91, 108 S.Ct. at 401 (citations omitted). The Court continued: "The last kind of evaluation, in particular, must be made 'with great speed, usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services.'" *Id.* (quoting *Gunter v. Hutcheson*, 674 F.2d 862, 865 (11th Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982)). The policy articulated by the *Langley* Court echoes the concern articulated by the *D'Oench* Court nearly fifty years earlier. Essentially, if secret oral or side agreements between a bank and the maker of a note were enforced, the function of the FDIC would be significantly undermined.

None of the secret or unwritten contractual conditions present in both the *D'Oench*

and *Langley* cases are present in the facts before us. Based on UAB's written application and other supporting documentation, Aetna issued UAB a bankers blanket bond. Indeed, the application was contained in the bank's records. If Aetna were arguing that, although the bond stated that the limit for employee dishonesty was $5,000,-000, the real limit, which was orally agreed to by the bank, was only $1,000,000, then the concerns that gave rise to the equitable estoppel doctrine of *D'Oench* and the subsequent enactment of section 1823(e) would be triggered. But Aetna is not making such an argument.

Additionally, assuming that an insurance policy is an asset within the meaning of the statute, a conclusion Aetna contested at the district court level, an insurance policy, due to its conditional nature, is not the type of asset that lends itself easily to an "overnight" or instantaneous assessment. Generally, insurance policies contain provisions specifying the conditions under which the insurer is obligated to pay and those under which the insurer is not obligated to pay. Unlike a promissory note or other negotiable instrument, there is no certainty, without reviewing potential policy defenses or limitations, whether insurance proceeds will be paid. It would thus be difficult to ascertain instantaneously the likely proceeds, if any, to which the FDIC would be entitled.

Also, in *Langley*, the Supreme Court reviewed some of the requirements enumerated in section 1823(e) and concluded that these "requirements ensure mature consideration of unusual loan transactions by senior bank officials, and prevent fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure." *Id.* 484 U.S. at 92, 108 S.Ct. at 401. The Supreme Court noted that, under the circumstances before it, "[n]either purpose [could] be adequately fulfilled if an element of a loan agreement so fundamental as a condition upon the obligation to repay is excluded from the meaning of 'agreement.'" *Id.* In the current case, Aetna is not colluding with officers of the failed bank in an attempt to rewrite the terms of the contract. Additionally, the alleged misrepresentations the bank made in its application for the bond are no reflection of the sufficiency or adequacy of the consideration the bank's directors gave to the bond's terms.

■■■ Another point the Supreme Court focused on in *Langley* was the type or nature of the defense being asserted. In *Langley*, the Supreme Court stated that section 1823(e) would not apply to a contract that was void but would to a contract that was merely void*able*. *Id.* at 93–94, 108 S.Ct. at 402–403. This is because a voidable title qualifies as a title or interest within the meaning of section 1823(e).[4] Thus, the characterization of an "asset" as either void or voidable has significant ramifications. The following excerpt of the Restatement (Second) of Contracts describes a

---

**4.** Circuit courts have generally held that assets that are void, as opposed to voidable, are not subject to the requirements of section 1823(e). *See FDIC v. Bracero & Rivera, Inc.*, 895 F.2d 824, 830 (1st Cir.1990) ("[S]ection 1823(e) would not entitle FDIC to recover on the note, because the note was discharged by the payment and cancellation of the underlying debt before FDIC ever obtained it. Since the note was invalidated by acts that were independent of the alleged secret agreement, the note was not an asset protected by section 1823(e)."); *Commerce Fed. Sav. Bank v. FDIC*, 872 F.2d 1240, 1244–45 (6th Cir.1989); *FDIC v. Turner*, 869 F.2d 270, 273–74 (6th Cir. 1989) (finding that the FDIC was a holder in due course of a note and, as such, it was subject only to real defenses, which included real fraud or fraud in the factum; holding that FDIC was barred from enforcing guaranty as a result of fraud in the factum); *Grubb v. FDIC*, 868 F.2d 1151, 1158–59 (10th Cir.1989); *Taylor Trust v. Security Trust Fed. S & L Ass'n, Inc.*, 844 F.2d 337, 342–43 (6th Cir.1988) ("The Trust also claims that the Trust is, simply stated, not bound by the pledge agreements because Taylor had no authority to pledge the trust account to secure the indebtedness of a third party. This defense is a real defense to the formation of a contract and renders the contract void *ab initio*, rather than merely voidable. A real defense would take the agreements out of the *D'Oench* doctrine...."); *FDIC v. Merchants Nat'l Bank of Mobile*, 725 F.2d 634, 639 (11th Cir.) ("Section 1823(e) does not apply to every inquiry concerning an asset.... In such cases the parties contend that no asset exists or an asset is invalid *and* that such invalidity is caused by acts independent of any understanding or side agreement."), *cert. denied*, 469 U.S. 829, 105 S.Ct. 114, 83 L.Ed.2d 57 (1984).

void contract: "If a misrepresentation as to the character or essential terms of a proposed contract induces conduct that appears to be a manifestation of assent by one who neither knows nor has reasonable opportunity to know of the character or essential terms of the proposed contract, his conduct is not effective as a manifestation of assent." Restatement (Second) of Contracts § 163 (1979). Put simply, no contract is formed under these circumstances because the terms of the contract were never assented to by one of the parties. This situation is commonly called fraud in the factum or fraud in the essence—or, as the Supreme Court stated, it is "the sort of fraud that procures a party's signature to an instrument without knowledge of its true nature or contents." *Langley*, 484 U.S. at 93, 108 S.Ct. at 402 (citation omitted).

 In contrast, a contract is void*able* "where one or more parties have the power, by a manifestation of election to do so, to avoid the legal relations created by the contract, or by ratification of the contract to extinguish the power of avoidance." Restatement (Second) of Contracts § 7 (1979). The Restatement provides the following illustrative examples of voidable contracts: "[V]oidable contracts are those where one party was an infant, or where the contract was induced by fraud, mistake, or duress, or where breach of a warranty or other promise justifies the aggrieved party in putting an end to the contract." *Id.* at comment b. The Restatement notes that "[u]sually the power to avoid is confined to one party to the contract...." *Id.* Additionally, the power of avoidance may be forfeited if the party who was induced by fraud to enter into the agreement unreasonably delays avoiding the contract. Finally, a voidable contract may be ratified.

 Although the distinctions between void and voidable contracts exist across all contractual contexts, the difference between a void contract and one which is voidable is particularly significant with regard to negotiable instruments. A holder in due course holds a negotiable instrument free from "all defenses of any party to the instrument with whom the holder has not dealt except ... (c) such misrepresentation as has induced the party to sign the instrument with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms...." U.C.C. § 3–305(2). Hence, while fraud in the inducement may not serve as a defense against a holder in due course, fraud in the factum can.

The availability or, more accurately, the non-availability of certain defenses against a holder in due course becomes particularly important when one considers that our circuit and others have held that the FDIC is a holder in due course of notes acquired in a purchase and assumption transaction. *See, e.g., FDIC v. Newhart*, 892 F.2d 47, 50–51 (8th Cir.1989); *FSLIC v. Murray*, 853 F.2d 1251, 1256 (5th Cir.1988) (according FSLIC holder in due course status); *FDIC v. Wood*, 758 F.2d 156, 161 (6th Cir.), *cert. denied*, 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 286 (1985); *Gunter v. Hutcheson*, 674 F.2d 862, 873 (11th Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982). In *Wood*, we incorporated into federal common law the concept of a holder in due course from state commercial law. *Id.* at 159. Our decision was based in part on the Supreme Court's decision in *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). In *Wood*, we summarized the *Kimbell Foods* Court's holding as follows: "[W]here a national rule is unnecessary to effectuate federal interests, state law should be incorporated as the federal rule of decision. The determinative factors are whether there is need for a nationally uniform body of law, whether application of state law would frustrate specific objectives of the federal program, and whether application of a federal rule would disrupt commercial relationships predicated on state law." *Wood*, 758 F.2d at 159. Although the *Kimbell Foods* Court concluded on the facts before it that it was unnecessary to adopt a federal rule, we concluded in *Wood* that, "if state law mandates that the corporate FDIC cannot be a holder in due course, the[ ] application of state law

would frustrate important objectives of the federal program." *Id.*

We based our holding on the following. First, makers would receive "an unjustified windfall" if we held otherwise. *Id.* at 160. "If the maker has a personal claim against the defunct bank, he would effectively have an absolute priority on that claim.... [A] maker with a claim against the defunct bank should have to stand in line with the other unsecured creditors proceeding against the FDIC in its capacity as a receiver." *Id.* Second, affording the FDIC holder in due course status would facilitate the FDIC's use of a purchase and assumption transaction, which is vastly preferable to a liquidation and which is more effective at fostering the FDIC's mission of promoting the stability and the public's confidence in the banking system. Because, for purchase and assumption transactions speed is of the essence, "[i]f the FDIC is forced to examine the bank's files to determine the value of its notes in light of the defenses to them, the transaction will not take place." *Id.* at 161. Additionally, "[t]he amount the

FDIC could not collect from makers with personal defenses would make the transaction that much more expensive." *Id.* And finally, we assessed the deleterious effects on commercial relationships of granting the FDIC holder in due course status. "A negotiable instrument is subject to transfer at any time, and the maker must always be aware that the transferee may be a holder in due course. From the maker's view, there is no difference between his bank failing and the note going to the corporate FDIC, and his bank failing after selling the note to a holder in due course." [5] *Id.*

It is against this backdrop that the *Langley* Court noted that fraud in the factum, citing the Uniform Commercial Code's holder in due course provision, "would take the instrument out of § 1823(e), because it would render the instrument entirely void...." *Langley*, 484 U.S. at 93, 108 S.Ct. at 402. The Court opined, however, that the bank's alleged misrepresentations about acreage or mineral interests "would constitute only fraud in the inducement, which renders the note voidable but not void." *Id.* at 94, 108 S.Ct. at 402.

**5.** The conclusion that the FDIC should be granted the status of a holder in due course has met with some criticism. One commentator asserts that the extension of the holder in due course doctrine to the FDIC "exceed[s] the permissible boundaries of the *D'Oench* doctrine fixed in section 1823(e)." Gray, *Limitations on the FDIC's D'Oench Doctrine of Federal Common-Law Estoppel: Congressional Preemption & Authoritative Statutory Construction,* 31 S.Tex. L.Rev. 245, 279 (1990). Specifically, this rule vitiates "key provision[s] of ... state commercial statute[s]," *id.* at 282, *i.e.,* "that one under its protection be a holder of the instrument and that the instrument not be part of a bulk transaction." *Id.* at 280 (footnotes omitted).

Another commentator questions our conclusion that extending holder in due course status to the FDIC will not disturb the expectations in commercial transactions.

[C]ommercial banks do not, as a rule, sell notes and leave their customers to face holders in due course. The holder in due course status was developed to allow for market transfer of commercial paper. Thus, four or five of the largest banks in the country have been packaging commercial loans for sale in the past few years. However, the banks first notify the customers of the intention to sell the notes. Also, the fact that the note will be sold is clearly disclosed on its face. Moreover, all of these borrowers have the benefit of legal counsel during the transaction. The packaging and reselling of these loans which

gives the purchaser holder in due course status is, in fact, a way for these large banks to create a form of commercial paper from bank loans. Only the *best* loans are sold because the purchaser takes them without recourse to the selling bank and wants assurance that good assets are being purchased.

In fact, the public can be fairly sure that by borrowing from the type of bank that may fail, it is a virtual certainty that its note will *not* be sold. Since 1976, individuals simply do not have to be aware of holder in due course law, since it cannot impact them. Businesses know that, as a matter of practice, only commercial paper intended for sale, and *not* bank loans, will result in holder in due course status.

Therefore, treating the FDIC as a holder in due course creates an enormous disruption of established commercial relationships predicated on state law. It takes away legal rights that protected the borrower prior to transfer to the FDIC. It is this factor which led the Court in *Kimbell Food[s]* to hold that "[b]ecause the ultimate consequences of altering settled commercial practices are so difficult to foresee, we hesitate to create new uncertainties, in the absence of careful legislative deliberation."

Note, *Borrower Beware: D'Oench, Duhme and Section 1823 Overprotect the Insurer When Banks Fail,* 62 S.Cal.L.Rev. 253, 304–305 (1988) (emphasis in original; footnotes omitted).

Consistent with the law of negotiable instruments and, more specifically, the holder in due course provision of the U.C.C., the *Langley* Court held that "[t]he bank therefore had and could transfer to the FDIC voidable title, which is enough to constitute 'title *or* interest' in the note.... If voidable title were not an 'interest' under § 1823(e), the FDIC would be subject not only to undisclosed fraud defenses but also to a wide range of other undisclosed defenses that make a contract voidable, such as certain kinds of mistakes and innocent but material misrepresentations."[6] *Id.* at 94, 108 S.Ct. at 402.

In the case before us, Aetna is asserting a fraud in the inducement defense, rather than a fraud in the factum defense.[7] Thus, if the insurance contract were a negotiable instrument, which it is not, the FDIC as a holder in due course[8] could collect on the bond, despite Aetna's protestations that fraudulent misrepresentations were made by UAB. The *Langley* Court's holding that voidable title is an "interest" for the purposes of section 1823(e) is both logical and consistent with accepted principles of commercial law. There is, however, no equivalent to the holder in due course doc-trine in the area of insurance bonds. As the defendant correctly states, an insurance contract "is a *conditional* promise to pay an *uncertain* sum of money that is payable only upon the occurrence of an *uncertain* condition (*i.e.*, the loss) only to the *insured.*" In contrast, a "negotiable instrument, such as a note, is a writing signed by the maker, containing an unconditional promise to pay a sum certain in money, on demand or at a definite time, to order or to bearer." *Wood*, 758 F.2d at 160. When extrapolated to the context of insurance bonds, the logic of the *Langley* decision unravels. Indeed, such an extension of the *Langley* Court's holding seems unintended. The U.C.C. sections cited for support by the *Langley* Court, sections 3–201(1) and 3–305(2)(c), are applicable only to negotiable instruments. *See* U.C.C. § 3–102(1)(e) (defining the term instrument, which is used in sections 3–201(1) and 3–305(2)(c), as negotiable instrument). Thus, while the transfer of a voidable negotiable instrument is, for commercial transactions, the transfer of an interest that would indisputably fall within the ambit of section 1823(e),[9] the transfer or assumption of an

---

**6.** We note that the *Langley* Court applied a pre–1989 amendments version of section 1823(e), which contained the phrase "title or interest." The amendments, in the context of the current case, are inconsequential. Neither party argues otherwise.

**7.** An argument can be made, however, that the bond was void *ab initio* rather than voidable. *See Hartley v. Hartford Accident & Indem. Co.*, 389 F.2d 91, 92 (5th Cir.1968) (per curiam) (under applicable state law fraud in the application for a bankers blanket bond rendered bond void *ab initio*); *Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co.*, 427 F.2d 862, 870 (4th Cir.1970).

**8.** In fact, the FDIC contends that Aetna's misrepresentation defense is barred by the holder in due course doctrine. The FDIC does not provide case law that suggests that this doctrine should be imported from the law of negotiable instruments to the current contexts. Because we find no need to extend this doctrine, we will not adopt the FDIC's position on this point.

We find further support for our conclusion in a recent Fifth Circuit case, *Sunbelt Sav., FSB Dallas v. Montross*, 923 F.2d 353, *reh'g en banc granted*, 932 F.2d 363 (5th Cir.1991):

[E]xtending federal holder in due course protection to non-negotiable instruments would bestow a benefit on the FDIC by changing the assets' nature—actually enhancing their value. ... When the negotiable note is in the hands of a holder in due course, the maker is left with few defenses, thus, the instrument's value is enhanced. Non-negotiable instruments, however, are contractual obligations, which do not enjoy holder in due course protections. The makers of variable interest rate notes sign only a contractual obligation to repay their debt; they had no expectation that [the] holder in due course doctrine would strip them of their defenses.

923 F.2d at 356.

**9.** We are not holding that section 1823(e) is applicable only to negotiable instruments. In fact, our circuit and others have either implicitly, explicitly, or unknowingly rejected this distinction. *FDIC v. Turner*, 869 F.2d 270 (6th Cir.1989) (applying § 1823(e) analysis to guaranty, a non-negotiable instrument, but ultimately holding that the guaranty is void for fraud in the factum); *FDIC v. P.L.M. Int'l, Inc.*, 834 F.2d 248, 254 (1st Cir.1987) (the "necessity for speed has led the majority of courts of appeals to reject the idea of treating negotiable and nonnegotiable instruments differently"); *FDIC v. Gulf Life Ins. Co.*, 737 F.2d 1513 (11th Cir.1984).

insurance bond is not ordinarily subject to the doctrines of commercial law, and should not be.[10]

■ A more logical outcome results if we follow the course outlined by the Seventh Circuit in *Howell v. Continental Credit Corp.*, 655 F.2d 743 (7th Cir.1981).[11] In *Howell,* the FDIC sued to recover rents due on some equipment leases held by the bank. The lessee, Howell, had stopped making payments on the leases because the bank had failed to meet its contractual obligation to acquire title to the equipment that it was leasing. The *Howell* court distinguished the cases applying section 1823(e):

> In all of th[o]se cases ... the FDIC was seeking to enforce a facially valid note or guarantee imposing a unilateral obligation on the maker to pay a sum certain amount to the bank.... [T]he makers' defenses were founded entirely upon separate and undisclosed agreements.... [T]hese holdings are inapplicable ... where the document the FDIC seeks to

enforce is one, such as the leases here, which facially manifests *bilateral* obligations and serves as the basis of the lessee's defense. In these situations, we do not believe the lessee should be held liable automatically simply because the FDIC has become a belated party to the transaction.

> . . . .

> ... This is not a case such as *D'Oench* and its progeny where the makers' defense depended solely upon a secret or unrecorded agreement, usually oral, of which the FDIC could have had no notice. The defense appellant posits here arises directly and explicitly from the provisions of the leases which were in the bank's files and which the FDIC now seeks to enforce.

*Id.* at 746–47 (emphasis in original).

Admittedly, because the bankers blanket bond Aetna issued to UAB does not contain a specific provision providing that coverage is withdrawn in the event of a misrepresentation on the application, the *Howell* rationale is not perfectly analogous.[12] But the

---

The applicability of section 1823(e) to nonnegotiable instruments should not go unbridled, however. This limitation is consistent with the contours of commercial law. In the realm of commercial law, there is a continuum, from agreements which differ from negotiable instruments in only minor respects, to those, such as ordinary contracts, which fail entirely to satisfy the requirements of negotiable instruments. White and Summers noted, for example, "[a] party may claim he is a holder in due course of a hybrid instrument which lies somewhere in the borderland between negotiable instruments and ordinary contracts...." J. White & R. Summers, *Uniform Commercial Code* 555 (1980). However, they noted, "[c]ourts should be even less willing to find negotiability in cases involving not hybrid paper but paper which bears all the characteristics of other, well recognized legal forms such as a contract or other merely executory instrument." *Id.* at 556. The insurance contract fails even to resemble a negotiable instrument and, thus, should not be treated as such for the purposes of section 1823(e).

**10.** We note additionally that the conditions of the note in *Langley* were not referred to in any written documents. *Langley,* 484 U.S. at 89, 108 S.Ct. at 400. In contrast, Aetna argues that the bond application and accompanying supporting materials contain misrepresentations—all of which are written documents.

**11.** The Fifth Circuit cited *Howell* with approval in *FDIC v. McClanahan,* 795 F.2d 512, 515 (5th Cir.1986).

**12.** In *FDIC v. O'Neil,* 809 F.2d 350 (7th Cir.1987), the Seventh Circuit reflected on its decision in *Howell. O'Neil's* discussion of *Howell* can be construed as limiting *Howell's* holding to allow only those defenses on the face of the asset. Significantly, however, the asset at issue in *O'Neil* was a promissory note. The *O'Neil* court observed:

> It is hard to quarrel with [the *Howell*] result. Not only was the lease explicit about the lessor's obligation; not only was it a lease rather than a promissory note (and how, merely by buying the lessor's interest, could the FDIC become a lessor without duties?); but [also] there was no side agreement in *Howell.* The conditions that Mrs. Howell sought to enforce against the FDIC's asset (i.e., the lease) appeared in the asset itself rather than in an agreement merely referred to in the asset. One may doubt whether section 1823(e) had any application—that would be like arguing that the FDIC could ignore the due date in a promissory note it had bought from a troubled bank, and call the loan immediately. The fact that there was an interpretive issue in *Howell* could not defeat Mrs. Howell's claim; a written obligation does not

fact remains that the blanket bond, unlike a promissory note, involves bilateral obligations.[13] To strip Aetna of the defense of material misrepresentation, a defense recognized under Tennessee law,[14] would effectively deny Aetna of the benefit of its bargain. To hold that section 1823(e) was applicable, we would have to engraft a holder in due course doctrine onto insurance law. As a result, as the Fifth Circuit stated in an analogous case, *Sunbelt Sav., FSB Dallas v. Montross*, 923 F.2d 353, *reh'g en banc granted*, 932 F.2d 363 (5th Cir.1991), we would be "giving the FDIC the ability to transmute lead into gold." 923 F.2d at 357.

As the *Howell* court attested, "the fact that the court must go outside the leases [or contracts] to test the *strength* and *validity* of the defenses is not fatal where the *foundation* and *basis* of that defense is in a document arguably meeting the nonsecrecy requirements of § 1823." 655 F.2d at 748 (emphasis in original). The bond and the application for the bond are not secret agreements. Both of these documents were contained in the bank's records.

The rationale from the recent Fifth Circuit decision in *Sunbelt Savings* supports our analysis:

> Allowing the FDIC to transform contracts into negotiable instruments would defeat the reasonable commercial expectations of the variable interest note makers [which are not negotiable instru-

ments]. Carried only a little further, this transformation would affect all contracts and even the title to real property. Alchemy is the province of Congress....
*Sunbelt Savings*, 923 F.2d at 357.

We note that a survey of section 1823(e) case law reveals that the vast majority of cases involve notes or other commercial paper. Our research reveals only one circuit decision interpreting section 1823(e) as applied to an insurance contract. In *FDIC v. Gulf Life Insurance Co.*, 737 F.2d 1513 (11th Cir.1984), the FDIC sued Gulf Life to recover insurance premiums paid by certain borrowers to insure installment loans. The bank was named as the primary beneficiary on the policies. The bank collected the premiums from the debtors and then passed 35 percent of the monies to Gulf Life; the bank retained the remaining 65 percent. The insurance policies contained a provision that provided for a refund of premiums if the indebtedness was terminated prior to the end of the period for which the insured contributed a premium. As a consequence of the purchase and assumption transaction involving the failed bank, many of the insured loans were prematurely terminated. The FDIC sued to recover 100 percent of the premiums; Gulf Life countered that it was responsible for only 35 percent, *i.e.*, the amount it received from the bank.

The Eleventh Circuit held that Gulf Life was liable for 100 percent of the premiums

---

become unwritten just because there is a question about its meaning.
*O'Neil*, 809 F.2d at 354 (citations omitted).

**13.** One commentator discussed, in the context of the *Howell* decision, the application of section 1823(e) to conditional, or bilateral, contracts:

> It is difficult to fit [the *Howell*] holding into the section 1823(e) paradigm established here: does the nature of the agreement with its facial bilateral components take it out of the term "agreement" in the statute? Or does this facial bilateralism legally satisfy each of the four conditions of section 1823(e), which such an agreement frequently would not meet, such as approval by the loan committee or directors? These two possible rationales for the *Howell* decision—not an agreement within the meaning of section 1823(e) and/or satisfaction of the four conditions—should both be accepted and made a necessary gloss on the

statute when applied in these circumstances, because, as noted before, "the policy behind a statute and the [literal words of the] statute itself need not be ... identical."
Gray, *Limitations on the FDIC's D'Oench Doctrine of Federal–Common Law Estoppel: Congressional Preemption & Authoritative Statutory Construction*, 31 S.Tex.L.Rev. 245, 292 (1990) (footnote omitted; citation omitted).

**14.** Tenn.Code Ann. § 56–7–103 provides:

> **Misrepresentation or warranty will not avoid policy—Exceptions.**—No written or oral misrepresentation or warranty therein made in the negotiations of a contract or policy of insurance, or in the application therefor, by the assured or in his behalf, shall be deemed material or defeat or void the policy or prevent its attaching, unless such misrepresentation or warranty is made with actual intent to deceive, or unless the matter represented increases the risk of loss.

paid, thereby rejecting Gulf Life's theories of waiver, estoppel, and unjust enrichment. The Eleventh Circuit, applying a *Kimbell Foods* analysis, concluded that the decision whether to select a purchase and assumption transaction or a liquidation would be thwarted if the FDIC were required to consider the defenses available under each state's law. Additionally, the court concluded that the FDIC process "demands national uniformity." *Gulf Life*, 737 F.2d at 1517. The court ultimately considered the effect of the denial of state defenses to Gulf Life. While noting that the case before it did not involve a negotiable instrument, the Eleventh Circuit observed that the majority of section 1823(e) cases involved notes, which would be immune from Gulf Life's defenses under the holder in due course doctrine. The Eleventh Circuit was thus persuaded that "in the majority of cases little dashing of commercial expectations would result from a uniform federal rule protecting the FDIC from such defenses." *Id.* at 1518.

Importantly, although, as the Eleventh Circuit noted, the majority of section 1823(e) cases may involve negotiable instruments, the case before us does not. We believe that the necessity for fashioning a uniform federal rule with regard to insurance contracts is belied by the very fact that so few cases are brought that involve conditional, or bilateral, contracts. Thus, we do not agree with the Eleventh Circuit's rationale for a uniform rule.[15]

In light of the preceding analysis, we find that section 1823(e) is inapplicable to Aetna's bankers blanket bond. The primary purpose of *D'Oench* and section 1823(e) is to provide notice to federal bank examiners and not to change conditional promises to pay into absolute obligations. Essentially, we are holding that when the FDIC, in the course of a purchase and assumption transaction, finds a bankers blanket bond, it acquires the bond with knowledge of the recognized defenses available under insurance law. Our holding is limited to this particular bond only. Our finding no way touches upon the merits of Aetna's misrepresentation defense.

### III.

Aetna also argues that the district court erred when it barred, pursuant to section 1823(e), Aetna's adverse agency defense. Aetna claims that its agent, CCI, which was owned by Jake Butcher's brother, was aware of the misrepresentations made by UAB on its application for the bankers blanket bond. Thus, Aetna argues, under Tennessee law the insurance contract "was invalid from its inception." We find section 1823(e) inapplicable to Aetna's adverse agency defense for the same reasons we found it inapplicable to Aetna's misrepresentation defense. We note that Tennessee state law has long recognized the adverse agency defense. Under Tennessee law, if an agent, without the principal's knowledge, represents the adverse party in a transaction, the resulting contract is voidable at the option of the uninformed principal. *See Delta Materials Handling, Inc. v. Prince*, Shelby Equity No. 37, 1989 WL 40861 (Tenn.Ct.App.1989) (unpublished); *W.W. Dillon & Co. v. Sharber*, 19 Tenn.App. 488, 90 S.W.2d 533 (1936); *Hawkins v. Byrn*, 150 Tenn. 1, 261 S.W. 980 (1924).

### IV.

Aetna also asserts that the district court erred when it barred Aetna's alter ego defense. Aetna argues the following. A fidelity bond insures a corporation against losses resulting from the acts of its *employees* but acts by the *corporation* itself are not insured. If an individual, in this case Jake Butcher, dominates a corporation based on authority derived from his ownership of stock and offices held in the

---

**15.** Additionally, the FDIC cites to several more recent Eleventh Circuit decisions in this area. *See FSLIC v. Gordy*, 928 F.2d 1558 (11th Cir. 1991); *Victor Hotel Corp. v. FCA Mortgage Corp.*, 928 F.2d 1077 (11th Cir.1991); *Twin Constr., Inc. v. Boca Raton, Inc.*, 925 F.2d 378 (11th Cir.1991); *Kilpatrick v. Riddle*, 907 F.2d 1523 (5th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 954, 112 L.Ed.2d 1042 (1991). To the extent that our decision is not in accordance with those decisions, we disagree with the Eleventh Circuit's interpretation of section 1823(e).

corporation, the individual constitutes the alter ego of the corporation and, as such, is no longer an employee within the terms of the bond. Hence, such individual is not covered by the bond.

The bankers blanket bond defines an employee, in pertinent part, as "(1) an officer or other employee of the Insured, while employed in, at, or by any of the Insured's offices or premises covered hereunder...." Aetna argues therefore that Jake Butcher was not an employee as defined in the bond and, as a result, Aetna should not be required to pay on the bond.

Aetna offers in support of its position a Fourth Circuit case, *Phoenix Sav. & Loan, Inc. v. Aetna Casualty & Sur. Co.,* 381 F.2d 245 (4th Cir.1967) (*Phoenix I*), and its successor, 427 F.2d 862 (4th Cir.1970) (*Phoenix II*). In *Phoenix I,* the district court not only allowed Aetna's alter ego defense but also granted summary judgment in favor of Aetna on the issue. The Fourth Circuit reversed. It did not, however, dispute the availability of the alter ego defense. Rather, it held that there was a factual question, *i.e.,* "the record [did] not demonstrate clearly ... corporate control by the malefactors." 381 F.2d at 251. The court recognized the viability of an alter ego defense and expressed concern about the possibility that, if Aetna were required to pay on the bond, then, as stockholders, the malefactors could in essence benefit from their own malfeasance. The court stated that "the wrongdoers ... should not be allowed under any circumstances to profit from their own reprehensible and criminal conduct." *Id.* at 252.

In *Phoenix II,* the district court granted a directed verdict in favor of Aetna based on its alter ego defense. The Fourth Circuit again reversed but still recognized the alter ego defense; it merely held that the district court improperly granted a directed verdict.

In the case at bar, the district court chose not to follow the *Phoenix* cases but, at the FDIC's urging, chose to bar Aetna's alter ego defense on the basis of a Fifth Circuit case, *FDIC v. Lott,* 460 F.2d 82 (5th Cir.1972). In *Lott,* despite the fact that the president of the bank was a controlling shareholder and also operated the bank, the Fifth Circuit held that the alter ego theory was not an available defense under the circumstances presented. In part, *Lott* was based on the fact that the bank president "was not the bank's sole shareholder" and that he could not "participat[e] in any recovery." *Id.* at 87. Additionally, the *Lott* court determined that the bank president's knowledge could not be imputed to the corporation because "he [was] deemed to have an adverse interest [to the bank] and [thus] the knowledge possessed by him in the transaction [was] not imputable to the bank." *Id.* at 88. Finally, the *Lott* court expressed the concern that "[i]nnocent shareholders and creditors should not have to bear a loss when the fraudulent majority shareholder will not benefit from his fraud." *Id.* at 87.

The Fifth Circuit recently revisited this issue in *City State Bank in Wellington v. United States Fidelity & Guaranty Co.,* 778 F.2d 1103 (5th Cir.1985). In *Wellington,* the Fifth Circuit applied the alter ego theory to bar recovery. It found that the bank's vice president, who was aware of the president's dishonesty, owned 40 percent of the bank's stock and would directly benefit from any recovery under the bond, unlike the situation in *Lott.*

The FDIC argues that, because recovery under the bond will not benefit Butcher, the equitable concerns justifying the application of the alter ego defense are not present here. While we agree that equity may not mandate the application of an alter ego defense, we find that Aetna is also asserting a defense based on its contract. If Jake Butcher were not considered an employee within the language of the bond, then Aetna would not be required to pay on the bond. The FDIC dismisses this aspect of Aetna's alter ego defense in a footnote. The district court, however, did not review Tennessee law to determine whether the alter ego defense is available to Aetna under the facts before us. Aetna may well be able to assert such a defense. For example, in *Neese v. Fireman's Fund Insurance Co.,* 53 Tenn.App. 710, 386 S.W.2d 918

(1964), a Tennessee appeals court found that a subsidiary company was in reality the alter ego of its parent corporation and thus the bankruptcy trustee of the parent corporation could not recover on the subsidiary's bond. Thus, we remand for reconsideration of this issue.

## V.

Aetna also argues that the district court erred when it failed to grant Aetna a judgment notwithstanding the verdict or a new trial because Aetna presented overwhelming evidence that UAB officers, not in collusion with Butcher, knew that he had dishonestly employed a convicted felon at the bank, which would terminate coverage on the bond under section 12.

■■■ The question to be addressed in reviewing a district court's denial of a motion for JNOV or for a directed verdict is whether the evidence, when viewed in the light most favorable to the nonmoving party, raises any material questions of fact for the jury. This court must not pass on the credibility of witnesses, weigh the evidence, or substitute our judgment for that of the factfinder. *Agristor Leasing v. A.O. Smith Harvestore Prods., Inc.,* 869 F.2d 264, 268 (6th Cir.1989); *Frost v. Hawkins County Bd. of Educ.,* 851 F.2d 822, 826 (6th Cir.), *cert. denied,* 488 U.S. 981, 109 S.Ct. 529, 102 L.Ed.2d 561 (1988). Because several witnesses testified that the felon allegedly employed by the bank, Jesse Barr, was really employed as Jake Butcher's personal consultant, the district court did not err in denying Aetna's motion for a judgment notwithstanding the verdict or for a new trial.

■■■ Aetna also argues that the district court committed prejudicial error by instructing the jurors that mere silence by officers as to Butcher's dishonesty could constitute collusion. We find no merit to this argument either. Specifically, Aetna objects to the following jury instruction:

> In determining whether a director or officer was in collusion with Jake Butcher, you may consider the silence of that person or his or her failure to report the

dishonesty to the Board of Directors or regulatory authorities as evidence of collusion.

As we stated earlier, Aetna asserts that this instruction equates silence with collusion. The district court rejected this argument. Further, it aptly stated why Aetna's argument should fail:

> [T]he instruction does not equate silence with collusion; it simply states the logical conclusion that silence may be considered as evidence of such collusion. The sentence immediately following this one in the Court's charge reads, "I further instruct you that someone who colludes with another is one who enables, participates with or otherwise aids and abets his dishonest act by action or inaction." Placed in this context, the statement by the Court was not erroneous.

We adopt the district court's sound rationale and reject Aetna's argument that the instruction was prejudicial.

**AFFIRMED IN PART, REVERSED IN PART and REMANDED** for further proceedings consistent with this opinion.

DAVID A. NELSON, Circuit Judge, concurring in the judgment and in all but Parts II and III of Judge Guy's opinion.

■■■ Although I agree with much of what is said in Part II, it seems to me unnecessary to decide whether 12 U.S.C. § 1823(e) is or is not applicable to Aetna's bond. Even if 1823(e) applies to such bonds—and I am inclined to think that an asserted right to recover on an insurance contract can be an "asset" under 1823(e) no less than an asserted right to recover on a negotiable instrument—it seems to me that the "agreement" that arguably tends to diminish or defeat the FDIC's interest in the asset is part and parcel of the asset itself, and as such it meets each of the four requirements of the statute.

The bank's application did not ripen into an agreement until Aetna issued the bond. When the bond was issued, the application was an integral part of it—and it was (1) in writing, (2) executed by the bank, (3) ap-

proved by the Board of Directors, and (4) has continuously been an official record of the bank. It seems to me that the "agreement" in question is thus valid against the FDIC under the plain language of the statute.

Except to the extent indicated above, I agree with Part III in its entirety. On remand, Aetna should be allowed to present its misrepresentation and adverse agency defenses.