In the Matter of The LIQUIDATION OF CITY & COUNTY BANK OF KNOX COUNTY, Knoxville, TN.

Claim of CITIZENS BANK OF SNEEDVILLE.

Court of Appeals of Tennessee, Eastern Section.

Oct. 7, 1992.

Permission to Appeal Denied by Supreme Court March 22, 1993.

D. Scott Hurley, with Claiborne, Davis, Buuck & Hurley, Knoxville, for appellant.

Boyd W. Venable, III, with Shanks & Blackstock, Knoxville, John Parker, with FDIC, Washington, DC, for appellee.

## OPINION

SANDERS, Presiding Judge (Eastern Section).

This is another appeal which has its genesis in the failure of one of the numerous "Butcher banks." On May 27, 1983, the Tennessee State Commissioner of Banking (Commissioner) closed and took possession of the City and County Bank of Knox County (C & C) in accordance with T.C.A. § 45–2–1502(c)(1). The Commissioner appointed the Federal Deposit Insurance Corporation (FDIC) as receiver of the closed bank pursuant to T.C.A. § 45–2–802. The FDIC accepted the appointment, as it was required to do under 12 U.S.C. § 1821(e).

Prior to the closing of C & C it served as a correspondent bank for a number of smaller banks. In its capacity as a correspondent bank, other banks, including the claimant, Citizens Bank of Sneedville (Citi-

zens) kept substantial sums of money on deposit with C & C. The deposits with C & C by Citizens and other banks were credited and debited as all other checking accounts in C & C.

On January 5, 1983, C & C set out on a plan to help C.H. Butcher, Jr., its principal stockholder, raise $30,000,000 to purchase two savings and loan associations in Florida. As a part of the scheme to raise these funds, C & C had the personnel in its correspondent department call other banks which had funds on deposit with it and solicit their participation in loans held by C & C. On that date Citizens had approximately $500,000 on deposit with C & C. Without calling or contacting Citizens to get its permission to do so, C & C withdrew from and debited to Citizens's account the sum of $850,000. The first notice Citizens had of this transaction was approximately 6:00 p.m. on January 5 when the president of Citizens, Mr. Jerry Mitchell, was informed by a bookkeeper for C & C, Tammy Lynn, that Citizens's account had been overdrawn. Mr. Mitchell was told that the Citizens account had been credited with participation in three loans. One was a participation by Citizens in the amount of $300,000 in a loan made to C.H. Butcher, Jr., by Blount National Bank of Maryville in the amount of $5,500,000. One was a participation by Citizens in the amount of $300,000 in a loan made by C & C to Knox Cable TV in the amount of $1,000,000. The other was a note for $250,000 executed by Syndicate Cable Investment Trust.

Upon learning this had been done, Mr. Mitchell inquired as to who had authorized the withdrawals and charges to Citizens's account and was told it was Eunice Davis of the correspondent department of C & C. Mr. Mitchell demanded that the transaction be rescinded, but that was not done. Citizens persisted in its efforts to get C & C to rescind the transactions and restore its $850,000 until C & C was closed by the Commissioner in May, 1983.

After FDIC was appointed receiver of C & C, Citizens filed claims with FDIC as receiver of C & C for its funds wrongfully appropriated by C & C. It filed three separate claims with FDIC. One claim was based on the $300,000 in connection with the C.H. Butcher, Jr., note; one was for the $300,000 in connection with the Knox Cable TV note; and one was in connection with the $250,000 note of Syndicate Cable Investment Trust. FDIC denied the claims, and that precipitated this litigation.

The salient facts in the case are without dispute. Only Citizens offered proof. No proof was offered by FDIC. The proof, in addition to the facts recited above, showed Citizens was a small state bank with capital of approximately $1,250,000. T.C.A. § 45–2–1102 provides "no state bank shall be allowed to lend any one (1) person, firm or corporation ... more than fifteen per cent (15%) of its capital, surplus and undivided profits." In view of Citizens's limited capital, its legal lending limit on any one loan was approximately $200,000. The participation by a bank in a loan is classified as a loan within the meaning of the statute. Each of the $300,000 participations would constitute approximately 23% of Citizens's capital and the $250,000 note would be approximately 19%. This made each of these transactions in violation of T.C.A. § 45-2-1102. Since C & C refused to refund Citizens's $850,000 and, although Citizens had not acquiesced in the transactions, it knew these transactions would show it to be in violation of T.C.A. § 45-2-1102. Consequently, Citizens immediately notified the Tennessee Commissioner of Banks, the FDIC and the Federal Bureau of Investigation as to what had happened. The record fails to show what action, if any, any of them took except that on a subsequent bank examination FDIC classified each of the transactions to be a violation.

Even though Mr. Mitchell, the president of Citizens, told C & C he would not accept participation in the loans and requested the transactions be rescinded, some two or three days later C & C sent Citizens documents purporting to assign to it $300,000 in a $5,500,000 loan made by Blount National Bank to C.H. Butcher, Jr., a $300,000 interest in a $1,000,000 loan which C & C purportedly made to Knox Cable TV, Inc., and a $250,000 note from Syndicate Cable In-

vestment Trust payable to C.H. Butcher, Jr.

There are some interesting observations to be made about the documents sent by C & C to Citizens. C & C purported to convey Citizens a participating interest in a $5,500,000 loan made by Blount National Bank to C.H. Butcher, Jr., but the record fails to show that C & C ever owned an interest in that note. C & C also purports to convey a $300,000 interest in a $1,000,000 note dated 1–5–83 on which C & C purportedly made a loan on 4–1–90 to Knox Cable TV, Inc., but the record fails to show that any such loan was ever made by C & C to Knox Cable TV, Inc. It appears from the record that the note furnished to Citizens in support of this alleged assignment was a note dated 12–2–82 for $1,000,000 from Knox Cable TV, Inc., to seven other cable companies. This note was assigned by the seven cable companies to C.H. Butcher, Jr., on January 5, 1983, and on the same date assigned by C.H. Butcher, Jr., to Butcher–Tennessee Investment Corp. and Butcher–Tennessee Investment Corp. made an assignment of the same date to C & C. The record fails to show what consideration went from C & C to Butcher–Tennessee Investment Corp. for the assignment of the note, but it exceeds the realm of common sense to think that C & C would have made a loan to Knox Cable TV, Inc., on such a note. Since FDIC offered no proof, no effort was made to explain such absurdity. The third document tendered by C & C to Citizens, and for which C & C took $250,000 of Citizens's money, was a document in which C & C owned no interest. It was a note dated January 1, 1983, for $250,000 from Syndicate Cable Investment Trust to C.H. Butcher, Jr., falling due January 1, 1985. It was assigned by C.H. Butcher, Jr., without recourse, to Butcher–Tennessee Investment Corp. on January 4, 1983, and it purported to be assigned by Butcher–Tennessee Investment Corp. without recourse to C & C on January 5, 1983. The proof shows, however, that the signature of the officer purporting to execute the assignment to C & C was a forgery, resulting in no assignment, in fact, having been made. There is no proof in the record as to how C & C came into possession of the note for the purpose of transmitting it to Citizens. We conclude that the tender of the documents which C & C sent to Citizens was nothing more than a "flimflam" to try to make the embezzlement of Citizens's funds look legitimate.

After Citizens was unsuccessful in getting C & C to rescind the transaction, Mr. Mitchell, president of Citizens at that time, did sign the acceptance of the loan participation certificates on the C.H. Butcher, Jr., note and on the Knox Cable TV, Inc., note, but the record fails to show what was done with the certificates after they were signed. Presumably the participation agreement on the C.H. Butcher, Jr., note was sent to either Blount National Bank or C & C and the certificate on the Knox Cable TV, Inc., note was sent to C & C, but for us to so hold would be pure conjecture. Mr. Ralph Hurley, president of Citizens at the time of trial, explained the reason for signing the certificates as follows:

"Q. What, you know, I guess, what, at that point, did Citizens or could Citizens do; what led to the execution of those two certificates?

"A. Well, we realized we were in deep trouble, that we had $850,000 stole out of our account by someone at the C & C Bank of Knox County, and we had a choice of two things, in my opinion: Write the $850,000 loss off and hope that the FDIC would not—would give us time to litigate on the claims and would not come in and shut us down, or either try to collect on the loans and mitigate our loss as best we could. So we did everything possible to do that and that is the starting of our—

"Q. So your testimony is the bank, on those two participations that were signed, made the decision to try to realize any value out of the collateral that could be realized?

"A. We tried to realize anything we could, to salvage anything we could.

"Q. While doing that, did Citizens Bank make any demands or take any actions with contacts with C & C Bank of Knox County about this transaction?

"A. Yes. There was numerous telephone calls made. There was letters written. There was telegrams sent and memos. There was verbal requests that they undo or take back those illegal acts.

"Q. Were these three loans ever rescinded by C & C Bank of Knox County?

"A. No, sir, they was not...."

After the closing of C & C, Citizens recouped some of its losses from the fidelity bond it held on Mr. Emmett Foster who was chairman of the board of Citizens and also president and chairman of the board of C & C at the time this transaction took place. It also recouped approximately $30,-000 from the bankruptcy of C.H. Butcher, Jr., leaving a net loss in excess of $500,000.

Upon the trial of the case the chancellor held that, as a matter of law, Citizens was precluded from recovery of any amount of its loss from FDIC in its capacity as receiver of C & C. In his determination of the case, the chancellor filed a memorandum opinion in which, as pertinent here, he said: "The FDIC relies upon USC § 1821(d)(9)(A) and § 1823(e), and *D'Oench Duhme and Company v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942) in defense of Citizens's claims. The effect of those statutory provisions, and of *D'Oench* is that the FDIC, as Receiver of C & C, is not bound by unwritten and unrecorded transactions, which are likely to mislead regulatory authorities. The United States Supreme Court has continued to recognize the doctrine relied upon by the FDIC. *Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987).

"The defense raised by the FDIC is meritorious, *there being no documentary record supporting Citizens's contention the loans were not as shown in the bank's records.* Citizens's claim that the loans exceeded its lending limits, and are therefore void does not provide a basis for recovery. Perhaps, if the FDIC were attempting to recover on a void transaction from Citizens it would be barred, but even that is not clear. The federal statutory provisions, and D'Oench envision that the bank in receivership, here C & C, have documentation supporting a claim adverse to the bank in receivership in order to sustain a claim against the Receiver, the FDIC. The statutory limits on the amount Citizens could lend are a percentage of its capital, surplus and undivided profits. T.C.A. 45–2–1102, and 45–2–1105. However, there is not shown to be any documentation in C & C's records of those limits on Citizens legal ability to loan. Thus, the FDIC is not bound by them. *Such records of the transactions as there are in C & C's records reflect regular banking transactions as between C & C and Citizens,* and the federal law prohibits going outside those records to provide Citizens a defense." (Emphasis ours.)

Citizens has appealed, saying the court was in error. We must agree, and reverse for the reasons hereinafter set forth.

■ The fallacy in the chancellor's holding stems from the fact that the record fails to show what documents, if any, were in the records of C & C to which 12 U.S.C. § 1821(d)(9)(A) and § 1823(e) or *D'Oench Duhme and Company v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942) or *Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987) would be applicable. 12 U.S.C. § 1821(d)(9)(A) provides:

**(9) Agreement as basis of claim**

  **(A) Requirements**

    Except as provided in subparagraph (B), any agreement which does not meet the requirements set forth in section 1823(e) of this title shall not form the basis of, or substantially comprise, a claim against the receiver or the Corporation.

§ 1823(e) provides:

**(e) Agreements against interests of Corporation**

  No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—

  **(1)** is in writing,

(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(4) has been, continuously, from the time of its execution, an official record of the depository institution.

In the *D'Oench Duhme & Company* (DDC) case, relied upon by the chancellor, the FDIC had taken over a failed bank and acquired in its assets a $5,000 demand note executed by DDC. DDC was a securities dealer and had sold the bank certain bonds which had defaulted. DDC had executed the note to enable the bank to carry the note and not show any past due bonds. Proceeds of the bonds were to be credited on the note. The receipt given to DDC for the note contained the statement: "This note is given with the understanding it will not be called for payment, all interest payments to be repaid." FDIC had no knowledge of the existence of the receipt until after its demand for payment was made. DDC defended on the basis of lack of consideration. The district court held DDC liable and the circuit court of appeals affirmed, holding FDIC was the equivalent of a holder in due course. The U.S. Supreme Court, in affirming the lower courts, said:

"Public policy requires that a person who, for the accommodation of the bank, executes an instrument which is in form a binding obligation, should be estopped from thereafter asserting that simultaneously the parties agreed that the instrument should not be enforced."

Furthermore, the fact that creditors may not have been deceived or specifically injured is irrelevant. As we held in the *Deitrick [v. Greaney]* case, 309 U.S. [190] page 198, 60 S.Ct. [480] page 484, 84 L.Ed. 694 it is the "evil tendency" of the acts to contravene the policy governing banking transactions which lies at the root of the rule. *See* 7 Zollman, Banks & Banking (1936) § 4783.

\*     \*     \*     \*     \*     \*

Plainly one who gives such a note to a bank with a secret agreement that it will not be enforced must be presumed to know that it will conceal the truth from the vigilant eyes of the bank examiners. .... The test is whether the note was designed to deceive the creditors or the public authority or would tend to have that effect.

315 U.S. at 460, 62 S.Ct. at 680.

The holding in DDC was in 1942 and this holding was codified in the U.S.Code in 1950 by the enactment of § 1823(e).

In *Langley v. FDIC,* relied upon by the chancellor, Langley had borrowed money from the bank to purchase land. He executed a note, a collateral mortgage, and a personal guarantee of the note to secure the payment of the note. The bank failed and FDIC acquired the note as an asset of the failed bank. Upon trial, Langley defended against FDIC's claim, saying the land purchase and the note were procured by the bank's misrepresentations, that it overstated the amount of land and mineral acres in the tract and falsely stated there were no outstanding mineral leases on the property. No references to the alleged misrepresentations appeared in either the documents executed by Langley or in the bank's records. The court held that under § 1823(e) such a defense was of no avail to Langley. As pertinent here, the court said:

One purpose of § 1823(e) is to allow federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets. ....

A second purpose of § 1823(e) is implicit in its requirement that the "agreement" not merely be on file in the bank's records at the time of an examination, but also have been executed and become a bank record "contemporaneously" with the making of the note and have been approved by officially recorded action of the bank's board or loan committee.

\*     \*     \*     \*     \*     \*

A condition to payment of a note, including the truth of an express warranty, is part of the "agreement" to which the writing, approval, and filing requirements of 12 U.S.C. § 1823(e) attach. Because the representations alleged by petitioners constitute such a condition and did not meet the requirements of the statute, they cannot be asserted as defenses here. ....

108 S.Ct. 396, 401, 403.

In the case at bar, we are not dealing with an asset of C & C which came into the possession of FDIC when it took over the bank, nor are we dealing with an agreement between Citizens and C & C. We are dealing with a claim of Citizens's for money literally stolen from it by C & C prior to FDIC's becoming its receiver. The claim of Citizens would sound in tort, not in contract. In the case of *Astrup v. Midwest Federal Savings Bank*, 886 F.2d 1057, 1059 (8th Cir.1989), the Eighth Circuit Court of Appeals, in affirming a judgment by the district court in a tort action, said:

[T]he District Judge rightly held that it would be an extension of *D'Oench Duhme* to apply it to a tort claim. The *D'Oench Duhme* doctrine simply forbids fabrication of fictitious assets for inclusion in the accounts receivable portfolio of regulated financial institutions tending to mislead and deceive bank examiners in their investigations to determine the financial condition of such institutions. That doctrine affords no protection against tort claims against a financial institution, whether for personal injuries to a motorist in a collision with an armored car bringing money to the S. & L. office, or for insider profits in a sale of securities violating Securities and Exchange regulations, or for fraudulently entering into transactions involving discriminatory interest rates, such as the agreements alleged by plaintiff in the case at bar.

In the case of *Federal Deposit Insurance Corporation v. Nemecek*, 641 F.Sup. 740, the court was dealing with a suit by FDIC on a note that had been satisfied by the maker before the bank failed. In addressing the application of § 1823(e), the court said:

However, by its terms, in order for this section to apply the FDIC must first have acquired the asset from the failed bank. This section has no application where "the parties contend that no asset exists or an asset is invalid and that such invalidity is caused by acts independent of any understanding or side agreement." *F.D.I.C. v. Merchants Nat. Bank of Mobile*, 725 F.2d 634, 639 (11th Cir.) cert. denied, 469 U.S. 829, 105 S.Ct. 114, 83 L.Ed.2d 57 (1984). *See also Federal Deposit Ins. v. Blue Rock Shopping Center*, 766 F.2d 744 (3d Cir.1985); *Howell v. Continental Credit Corp.*, 655 F.2d 743 (7th Cir.1981); *Riverside Park Realty Co. v. F.D.I.C.*, 465 F.Supp. 305, 312–13 (M.D.Tenn.1978).

\*　　\*　　\*　　\*　　\*　　\*

Therefore, when the FDIC purchased the Bank's assets, it could not have purchased defendants' note, as it had been previously extinguished. Section 1823(e) applies only to assets which the FDIC has acquired.

We, accordingly, hold that neither the doctrine of *D'Oench Duhme* nor § 1823(e) is controlling in the case at bar.

In making the withdrawals of funds from Citizens's deposit, C & C purported to be making loans for Citizens, but C & C had no authority to make such loans for Citizens. "Where a bank loans funds of a depositor without his authority, it is absolutely responsible for the money, regardless of its care in the making of the loan." 9 C.J.S. Banks and Banking, § 384(b) Loans of Funds of Others, p. 800.

■ The FDIC, as receiver of C & C, attempts to escape liability for C & C's unauthorized acts by asserting that the signing of the two alleged loan participation certificates by Jerry Mitchell, president of Citizens, constituted a ratification of C & C's conduct. We cannot agree. As previously stated in this opinion, there is no showing in this record that C & C ever owned any interest in the $5,500,000 note which C.H. Butcher, Jr., gave to Blount National Bank or that Blount National

Bank executed the participation agreement. Also, there is no evidence that C & C ever made a $1,000,000 loan to Knox Cable TV, Inc., for which it sent Citizens a $300,000 participation certificate. As for the $250,-000 note which C & C sent to Citizens, it showed on its face that C & C did not own an interest in it and the proof showed it had never been legally assigned to Citizens. But even if the documents did not have these infirmatives, the proof would not support a holding of ratification by Citizens. It is essential that the act of ratification be truly voluntary in character. 3 Am.Jur.2d Agency § 187. Moreover, there can be no ratification if the act, although voluntary, is done only because the purported principal is obligated to minimize his losses caused by the agent's wrongful act or because of duress or misrepresentation by the agent.

■ The proof shows Citizens signed the agreements only to mitigate its losses once it realized that C & C would not make restitution. As a general rule, there can be no ratification of an act which could not have been legally done by the ratifier himself in the first instance. 2A C.J.S. Agency § 68; cf. Carnes v. Polk, 44 Tenn. (4 Cold.) 87, 95 (1867) ("A contract or conveyance, void in itself, is incapable of confirmation...."); Tenn.Jur. Agency § 72.

T.C.A. § 45–2–1102(a)(1), as pertinent here, provides:

**Limit of loans to any one borrower** ...—(a)(1) Except as provided in this section, no state bank shall be allowed to lend any one (1) person, firm or corporation (including loans to a firm or loans to the several members thereof) more than fifteen percent (15%) of its capital, surplus and undivided profits. However, such loans may be in excess of that percent, but not above twenty-five percent (25%) ... if each specific loan in excess of fifteen percent (15%) is first submitted to and approved in advance in writing by the board of directors or by the finance committee of the bank and a record is kept of such written approval.

■ The record shows Citizens's board of directors or finance committee never approved these transaction. The proof also shows all of the alleged loans were made for the benefit of C.H. Butcher, Jr. The proof shows Citizens signed the agreements only to mitigate its losses once it realized that C & C would not make restitution. The two loan participations and the promissory note put Citizens in violation of the statutes set out above since Citizens would be lending 65% of its capital, surplus, and undivided profits to one person—C.H. Butcher, Jr., the ultimate recipient of these funds. As Citizens would not have been legally able to enter into such a transaction in the first instance, it was not capable of subsequently ratifying such a transaction. Professor Seavey states it well, "Thus if bonds beyond the constitutional debt limit are issued by municipal officers who have no power to issue bonds, the affirmance by a vote of the citizens does not make the bonds valid." Warren A. Seavey, Law of Agency § 33(F) (1964). Likewise, since Citizens had no authority to enter into the transaction in question, the affirmance of such action by Mitchell does not make the transactions valid.

Even if one considers each transaction separately, Mitchell's alleged act of ratification, by signing the two certificates and keeping possession of the note, did not constitute ratification by Citizens. Where formalities are requisite for the authorization of an act, its affirmance must be by the same formalities in order to constitute ratification. *Fulton County Fiscal Court v. Southern Bell Tel. & Tel. Co.* 289 Ky. 159, 158 S.W.2d 437, 439 (Ky.Ct.App.1942); 3 Am.Jur.2d Agency § 183; 2 Samuel Williston, A Treatise on the Law of Contracts § 278 (3d ed. 1959). The statute provides that any loan in excess of 15% of a state bank's capital, surplus, and undivided profits must be "submitted and approved in advance in writing by the board of directors or by the finance committee of the bank and a record kept of such approval." This was not done and each of the alleged loans exceeded 15% of Citizen's capital, surplus, and undivided profits.

The issues are found in favor of the Appellant. The decree of the chancellor is

reversed and the case is remanded to the trial court to fix Appellant's damages. The cost of this appeal is taxed to the Appellee.

GODDARD and FRANKS, JJ., concur.