5 F.3d 536
NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for
Alaska National Bank of the North, Plaintiff-Appellee,
v.
Lawrence M. SLAY, a/k/a Larry Slay, Defendant,
and
Louis F. DeLONG, a/k/a Frank DeLong; Juliet DeLong,
Defendants-Appellants.
 No. 92-36576.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Aug. 5, 1993.
Decided Aug. 27, 1993.
 
 Appeal from the United States District Court for the District of Alaska; No. CV-88-014, H. Russel Holland, District Judge, Presiding.
 D.Alaska
 AFFIRMED IN PART, REVERSED IN PART, AND REMAND.
 Before SCHROEDER, FLETCHER and ALARCON, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Louis F. DeLong and Juliet DeLong appeal the district court's grant of summary judgment to the FDIC holding them liable under a guarantee of credit extended by Alaska National Bank of the North to Omega Electric, Inc. We affirm in part, reverse in part, and remand.
 
 FACTS AND PROCEDURAL HISTORY[1]
 
 3
 In October 1983, Lawrence M. Slay ("Slay") and Louis F. DeLong ("DeLong") entered into an agreement to purchase Omega Electric, Inc. d/b/a Acme Electric ("Omega") from Don Chandler, chairman of the board of Alaska National Bank of the North ("Alaska National" or the "bank"), for $175,000. Alaska National agreed to provide the financing. In November 1983, Omega executed a promissory note in favor of Alaska National in the amount of $175,000 (the "purchase loan"), due to mature in November 1988 and secured by accounts receivable, equipment, and inventory. Louis DeLong and his wife, Juliet DeLong, jointly guaranteed the note. The guarantee they signed provided that they were responsible for "all liabilities and indebtedness which [Omega] has incurred or is under or may incur or be under to the Bank." (Excerpts of Record ("E.R.") at 58.) It further provided that it would be "a continuing guarantee" and would
 
 
 4
 cover all liabilities which [Omega] may incur or be under until the undersigned shall have given the Bank notice in writing to make no further advances on the security of this guarantee; provided that such notice by any one or more of the undersigned on any indebtedness or liability incurred prior to receipt by the Bank of such notice ... and in the event of such notice the Bank may cease to make any further advances to [Omega].
 
 
 5
 (Id.) Under the terms of the guarantee, the bank was not required to "exhaust its recourse nor to take any action against [Omega] or other parties on the collateral" before demanding payment from the guarantors. (Id.) Slay signed an identical document.
 
 
 6
 On October 1, 1985, DeLong sold his interest in Omega to Slay. At that time, Omega had borrowed an additional $200,000 from Alaska National under a revolving line of credit. The line of credit was paid off in March 1986. In June 1986, Slay approached Alaska National to request reissuance of the line of credit, informing the bank that DeLong did not wish to guarantee the new loan. Alaska National initially denied the loan request.
 
 
 7
 After some further negotiations with Slay, Alaska National agreed to renew the line of credit. A bank memorandum dated July 24, 1986 (the "July 24 memorandum") indicates that the bank's loan committee was willing to release the DeLongs from their unlimited guarantee so long as they continued to guarantee the purchase loan and DeLong agreed to subordinate "his claim to any and all debt in regards to" Omega. (E.R. at 59.) On July 28, 1986, Alaska National sent the DeLongs a letter to this effect which requested the DeLongs' signatures to show that they agreed to its terms (the "July 28 letter"). On that same day, Slay, acting on behalf of Omega, executed a new $200,000 note.
 
 
 8
 Rather than signing and returning the July 28 letter, DeLong met with the bank to discuss it. According to DeLong, at this meeting, he orally accepted the conditions outlined in the letter, but indicated that he wished to include as part of the arrangement a repayment schedule for consulting fees owed him by Omega. DeLong further asserts that, pursuant to the discussion, the bank was to amend the agreement. Upon arriving home from a business trip in mid-October, however, he did not find a revised agreement. He therefore sent a followup letter to Alaska National by which he sought to "conclude the matter." (Id. at 140.) DeLong's letter stated that while he "basically agreed to the tenure [sic] of the [July 28] letter," the agreement should include a repayment schedule for the subordinated debt. (Id.) DeLong claims to have enclosed with this communication a copy of the July 28 letter signed by both him and his wife. There is no evidence, however, that a signed copy of the July 28 letter was ever placed in the bank's files.
 
 
 9
 In February 1987, having defaulted on its obligations, Omega filed for chapter 11 bankruptcy. Alaska National filed suit against Slay and the DeLongs in state court on August 12, 1987, alleging $72,730 plus interest owing on the purchase loan and $67,487.39 plus interest outstanding on the line of credit. The complaint sought to hold Slay liable as a guarantor on both the purchase loan and the line of credit, and the DeLongs for the purchase loan only.
 
 
 10
 In September 1987, Alaska National notified the DeLongs and Slay that it was exercising its right to seize and dispose of the collateral. The DeLongs contend that the bank's efforts in this regard were woefully inadequate. According to them, although they and Slay cooperated with the bank by identifying and locating collateral, Alaska National did not claim it or sell it in a timely fashion, with the result that it declined dramatically in value. The bank claims that it was impeded in its efforts because some of the equipment it sought was kept on fenced property and the owner of the property refused to admit the bank's process server.
 
 
 11
 Alaska National did manage to execute on certain items. The bank seized four vehicles: a Chevrolet van, a Ditchwitch trencher, a John Deere backhoe, and a Ford ladder truck. These were kept in storage for almost seventeen months and were ultimately "sold" to the storage company for $7,871, $7471 of which went to pay accrued storage fees. Thus, only $400 was applied to Omega's indebtedness for the four vehicles. The record also shows that the bank disposed of certain other "miscellaneous" pieces of equipment for $4,945 in a sealed bidding process and credited Omega for that amount.
 
 
 12
 In October 1987, Alaska National was closed by the comptroller of the currency. The FDIC was appointed receiver for the failed bank and was substituted for Alaska National in its suit against Slay and the DeLongs. In March 1988, the FDIC removed the action to federal district court. The district court permitted the FDIC to amend its complaint to allege guarantor liability on the part of the DeLongs for the line of credit loan in addition to the purchase loan, notwithstanding the fact that in the original complaint Alaska National had not pursued the DeLongs for the line of credit obligation. The DeLongs, Slay, and others filed a third-party complaint in the federal action against Alaska National, its former officers and directors, and the FDIC alleging that the bank had mishandled the loans to Omega by unilaterally changing their terms, engaging in unauthorized collection practices, and generally acting in bad faith with the aim of driving the company into bankruptcy.
 
 
 13
 The district court disposed of the case in a series of partial summary judgment rulings.
 
 
 14
 On June 11, 1990, the court granted partial summary judgment to the FDIC on the question of liability, ruling that the DeLongs were liable as guarantors for both of the promissory notes at issue. The court held that the doctrine established by D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447 (1942), precluded the defendants from "advancing any defense, or part of a defense, which is based on oral understandings or agreements that they developed with [Alaska National] in July of 1986 or any other time." (Id. at 76.)[2]
 
 
 15
 On August 23, 1990, the court denied the DeLongs' request for a continuance to develop further evidence and granted summary judgment to the FDIC on the claims contained in the third-party complaint.
 
 
 16
 In a third order dated December 18, 1990, the court, noting that defendants had not challenged the FDIC's calculation, adopted the FDIC's representation that, as of July 15, 1987, the gross amount due on the two notes totalled $148,723.83.[3] The court, however, directed the FDIC to provide an accounting of the collateral seized and sold so that its value could be offset against the gross amount owing. At this juncture, the court declined to accept the estimate given by David Chausse, the bank's process server, in his deposition testimony that the four vehicles seized were worth $10,000.
 
 
 17
 The FDIC subsequently submitted additional documentation regarding the seized collateral, including appraisals for the vehicles in storage. Slay also furnished an affidavit in which he challenged Alaska National's and the FDIC's handling of the collateral. Slay's affidavit states that at the time Omega filed for bankruptcy, the value of equipment available to the bank as collateral was $285,645. Attached to the affidavit is an inventory of Omega's equipment from February 1986 which indicates that as of that date, the four vehicles together were valued at $33,500.
 
 
 18
 After considering the above submissions, the court ruled on May 31, 1991 that it was satisfied as to disposal of the "miscellaneous equipment" in a sealed bid process for $4,945, and deducted that amount from the total amount owing.[4] The court was still concerned, however, with the FDIC's method of valuation of the four vehicles it had sold to the storage company, and directed the FDIC to obtain an appraisal of those items. In its May 31 order, the court also disposed of a number of defendants' motions, reiterating its earlier ruling that the DeLongs had not been released from their unlimited guarantee by the bank[5] and further holding that, under the terms of the guarantee, the bank was not obligated to execute on the collateral before proceeding against the DeLongs.
 
 
 19
 On November 4, 1991, the court issued its final order in the case, granting summary judgment to the FDIC as to the value of the four vehicles on the basis of the FDIC's additional submissions. The court held that the vehicles had not been disposed of in a commercially reasonable manner, and therefore did not accept the storage company's $7,871 "bid" as representing the reasonable value of the property.[6] Noting that "[d]efendants have come forward with no evidence as to the value of the security," (id. at 222), the court adopted the Chausse's estimate of $10,000 as the fair and reasonable value of the vehicles at the time of repossession.[7] The court also credited the defendants with $6,088.20, the reasonable value of the storage of the equipment for 365 days, calculated at $16.68 per day.[8] On June 29, 1992, the court entered final judgment for the FDIC in the amount of $198,055.22 plus costs.
 
 
 20
 The DeLongs appeal various of the district court's rulings.[9]
 
 STANDARDS OF REVIEW
 
 21
 We review de novo the district court's grant of summary judgment and the conclusions of law upon which it was based. Saul v. United States, 928 F.2d 829, 832 (9th Cir.1991). We must determine whether, viewing the evidence in the light most favorable to the nonmoving party, there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. MAI Systems Corp. v. Peak Computer, Inc., 991 F.2d 511, 516 (9th Cir.1993).
 
 
 22
 A district court's grant of a motion to strike affirmative defenses is reviewed for an abuse of discretion. FSLIC v. Gemini Management, 921 F.2d 241, 244 (9th Cir.1990). The denial of a continuance to a party seeking further discovery is also reviewed under an abuse of discretion standard. Sablan v. Department of Finance, 856 F.2d 1317, 1321 (9th Cir.1988).
 
 DISCUSSION
 A. Guarantee
 
 23
 The DeLongs contend that Alaska National agreed to release them from their guarantee with respect to the $200,000 line of credit. They claim that the bank acknowledged that they would not guarantee the loan in the July 24 memorandum to file and the July 28 letter it sent to them. They further assert that, even though they sought to add a condition to the terms that were outlined in the July 28 letter, they acquiesced in them orally during their discussions with the bank and, by signing the letter and returning it in October, they effectively exercised their option to discontinue the guarantee.
 
 
 24
 Even if it is assumed that the DeLongs' oral representations to the bank and October correspondence are indicative of an agreement with the bank, a highly questionable proposition, the agreement is not a defense to the FDIC's action to collect on the note.
 
 
 25
 The enforceability of a guarantee against the FDIC is a question of federal, not state, law. 12 U.S.C. Sec. 1819(b)(2)(A). Suits in which the FDIC is a party are deemed to arise under the laws of the United States. FDIC v. Zook Bros. Constr. Co., 973 F.2d 1448, 1450 (9th Cir.1992). Thus, the DeLongs may only assert their defense that they had a binding agreement that served to release them from the guarantee if federal law permits it.
 
 
 26
 In D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447 (1942), the Supreme Court articulated a common law rule designed to implement "a federal policy to protect [the FDIC], and the public funds which it administers, against misrepresentations as to the securities or other assets in the portfolios of the banks which [the FDIC] insures or to which it makes loans." Id. at 457. The Court held that a borrower may not assert an undisclosed agreement with a bank to defeat the FDIC's interest in a note:
 
 
 27
 The test is whether the note was designed to deceive the creditors or the public authority, or would tend to have that effect. It would be sufficient in this type of case that the maker lent himself to a scheme or arrangement whereby the banking authority on which [the FDIC] relied in insuring the bank was or was likely to be misled.
 
 
 28
 Id. at 460.
 
 
 29
 Congress has codified the common law D'Oench doctrine in 12 U.S.C. Sec. 1823(e). See Falk v. Mt. Whitney Sav. & Loan Ass'n, 983 F.2d 156, 160 (9th Cir.1993).[10] Courts have interpreted section 1823(e) in light of the D'Oench doctrine, and vice versa. See, e.g., Langley v. FDIC, 484 U.S. 86, 92-93 (1987); Falk, 983 F.2d at 160; In re Century Centre Partners Ltd. v. FDIC, 969 F.2d 835, 838 (9th Cir. Nov. 5, 1992), cert. denied, 113 S.Ct. 2997 (U.S. June 21, 1993).
 
 
 30
 In Zook Brothers, the Ninth Circuit considered the effect of a continuing guarantee for a loan to Zook Brothers Construction signed by Louise Zook. The guarantee remained in the bank's files after the credit agreement was amended and new notes were taken, even though Louise Zook had not consented to the new arrangements. Louise Zook claimed that because she had not consented to material alterations in the credit agreement, she was released from the 1980 guarantee by operation of Illinois law. The court rejected Zook's argument, holding that both Sec. 1823(e) and D'Oench, Duhme barred the defense. "Federal law requires enforcement of the guaranty because the FDIC under D'Oench and Sec. 1823(e) is entitled to rely on documents in a loan file, and there is no basis for Zook's defenses based on state law as they depend on inferences contravening the guaranty which are raised, and may be proved, only by reference to documents which do not meet the requirements of Sec. 1823(e)." 973 F.2d at 1453; see also FSLIC v. Gemini Management, 921 F.2d 241, 246 (9th Cir.1990) (D'Oench, Duhme barred counterclaims and affirmative defenses based on an unsigned letter from bank because letter was not a "clear and explicit bilateral obligation").
 
 
 31
 The D'Oench doctrine controls here. The DeLongs may not rely upon their alleged oral acceptance of the bank's terms to defeat the FDIC's interest in their guarantee. As for the documents they have produced concerning their negotiations with the bank, although it appears that Alaska National intended to release the DeLongs from their guarantee with respect to the line of credit provided certain conditions were met, no executed agreement ever made its way into the bank's files. Thus the guarantee remained in effect.
 
 
 32
 The DeLongs rely on an exception to the D'Oench doctrine first articulated by the Ninth Circuit in FDIC v. Meo, 505 F.2d 790 (9th Cir.1974). In Meo, the court considered the plight of a borrower who executed a promissory note to a bank in exchange for shares of the bank's common stock that the bank never issued. The court declined to apply D'Oench, Duhme to bar Meo's defense of failure of consideration, reasoning that he was innocent of any wrongdoing and had not been negligent in failing to rectify the bank's error since he had no knowledge of it. Id. at 792-93.
 
 
 33
 Meo is not apposite. There was no mistake here, just a belated attempt by the DeLongs to alter the terms of their obligation. Although they argue that the bank was negligent in failing to memorialize their supposed acquiescence in the proposed terms of the release in its records, this is not the sort of negligence contemplated by Meo. As this circuit has recently explained, a borrower who "fails to ensure that the terms of the loan are explicitly incorporated into the obligation where opportunity to do so exists is guilty of 'negligence' " and cannot invoke the Meo exception. Century Centre, 969 F.2d 835, 838.
 
 
 34
 Howell v. Continental Credit Corp., 655 F.2d 743 (7th Cir.1981), the other case cited by the DeLongs, does not help them either. Howell is a Seventh Circuit case and not binding in this circuit. In any event, it is distinguishable. In Howell, the FDIC sought to enforce its rights against a borrower under certain leases that had been assigned to a failed bank as part of a loan transaction. The borrower claimed that the leases were invalid because the third-party lessor had failed to perform in accordance with their terms. The court held that because the "leases ... involved clearly manifest[ed] the bilateral nature of the lessee's and lessor's rights and obligations," D'Oench, Duhme did not bar the borrower's defense, which arose "directly and explicitly from the provisions of the leases which were in the bank's files." 655 F.2d at 743. Here, by contrast, the bank did not fail to perform under any of the provisions of the guarantee. Thus, the defense the DeLongs attempt to assert does not "arise" from the face of the guarantee.
 
 
 35
 Because the DeLongs' defenses to liability are all premised on extrinsic evidence that may not be used to defeat the FDIC's interest in the guarantee, the district court did not abuse its discretion in rejecting them. Nor did it abuse its discretion in denying appellants' request for a continuance to develop them.
 
 B. Collateral
 
 36
 The Delongs further contend that, in the letter giving them notice that it was exercising its rights with respect to the collateral, Alaska National represented that it "would pursue collection under the guaranty if, and only if, it did not realize enough from the sale of the collateral to satisfy the amount owing." (Appellants' Opening Br. at 33.) As the FDIC points out, the letter says no such thing. Appellants apparently refer to a portion of the letter which states: "Please be advised, the individual guarantors of this debt will be liable for any deficiency remaining on the obligation after the sale of the collateral." (E.R. at 149.)
 
 
 37
 In any event, the guarantee signed by the DeLongs unequivocally accorded the bank the right to proceed against them regardless of whether it had "exhaust[ed] its recourse ... on the collateral." (Id. at 58.) For the reasons discussed above, under D'Oench, Duhme, even if there were extrinsic evidence of a different understanding between the parties concerning the collateral, such a side agreement would not be enforceable against the FDIC.
 
 C. Amount of Setoff
 
 38
 The district court essentially conducted a trial on paper to determine the amount due under the guarantee. In addition to asserting that the court should have deducted the value of all of the potentially available collateral from Omega's indebtedness, a contention we have rejected, the DeLongs challenge the court's valuation of the four vehicles that were sold to the storage company.
 
 
 39
 The district court's resolution of this issue is problematic. At first the court refused to credit the process server's testimony as to the value of the vehicles, but in the end, it accepted Chausse's $10,000 estimate. Slay's affidavit, however, which the court declined to credit, indicates that some eighteen months earlier those items had been valued at $33,500.
 
 
 40
 In light of the apparent lack of appraisal expertise on the part of Chausse and the large discrepancy between his and Slay's figures, the district court's grant of summary judgment on this issue was improper. A genuine issue of fact remains as to the value of the seized vehicles. Accordingly, we remand for an evidentiary hearing to determine their worth at the time of seizure.
 
 
 41
 AFFIRMED in part, REVERSED in part, and REMANDED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 The facts are undisputed except as otherwise noted
 
 
 [2]
 At the time the court issued its initial ruling on liability, the DeLongs had not located the copy of the July 28 letter which they claim to have signed and mailed to the bank in October. After discovering it in a file, the DeLongs submitted the signed version of the letter to the court. The court declined to reverse its earlier ruling
 
 
 [3]
 Slay subsequently submitted an affidavit in which he took issue with this figure. The court evidently declined to reconsider the gross amount of Omega's indebtedness except to account for accrued interest up to the date of the final judgment in the case. The DeLongs do not challenge this figure on appeal
 
 
 [4]
 Appellants do not challenge the propriety of the miscellaneous equipment sale
 
 
 [5]
 See supra note 2
 
 
 [6]
 The FDIC does not contend that the sale was reasonable
 
 
 [7]
 The court used this figure in lieu of the appraisal supplied by the FDIC, which was somewhat lower
 
 
 [8]
 Presumably, this meant that the court subtracted $6,088.20 from the total storage fees of $7,471, and therefore deducted $1,382.80 from the $10,000 credit for the four vehicles. The basis for the court's adjustment of the storage fees was the FDIC's "acknowledg[ment] that seventeen months of storage fees was unreasonable, and that defendants are entitled to one year's credit for such storage fees." (E.R. at 224.) The DeLongs do not take issue with this aspect of the court's ruling
 
 
 [9]
 Slay does not appeal the judgment
 
 
 [10]
 Section 1823(e), which was amended in 1989 as part of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), provides:
 No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the [FDIC] unless such agreement--
 (1) is in writing,
 (2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
 (3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
 (4) has been, continuously, from the time of its execution, an official record of the depository institution.